**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 0 2021

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| LAURA LYNN HAMMETT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PORTFOLIO RECOVERY ASSOCIATES, LLC, a Limited Liability Company; DOES 1-99<br><br>Defendants | ) Case No.: 4:21CV189-KGB<br>)<br>)<br>) **COMPLAINT FOR STATUTORY**<br>) **VIOLATIONS OF THE**<br>) **TELEPHONE CONSUMER**<br>) **PROTECTION ACT AND THE**<br>) **FAIR DEBT COLLECTION**<br>) **PRACTICES ACT; AND TORTS OF**<br>) **INTENTIONAL INFLICTION OF**<br>) **EMOTIONAL DISTRESS,**<br>) **OUTRAGE AND INVASION OF**<br>) **PRIVACY, INTRUSION**<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>) This case assigned to District Judge Baker<br>) and to Magistrate Judge Kearney<br>)<br>)<br>) |

1.        Separate Defendant Portfolio Recovery Associates, LLC, one of the nation's largest credit purchasers and consumer debt collectors, has policies and practices they used to harass, annoy, intrude on the solitude, and deceive Plaintiff Laura Lynn Hammett. Plaintiff seeks damages under the Fair Debt Collection Practices Act,15 U.S.C. § 1692 *et seq*. ("FDCPA"), the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA"), the tort of Intentional Infliction of Emotional Distress, known as Outrage and the tort of Invasion of Privacy by Intrusion.

**Jurisdiction and Venue**

2.        This Court has original jurisdiction pursuant to 28 U.S.C. § 1332, because this is a civil action in which Laura Lynn Hammett ("Plaintiff" or "Hammett") is a citizen of and residing in Arkansas; Defendant Portfolio Recovery Associates, LLC ("Defendant" or "PRA") is a Delaware Limited Liability Company and is not registered with the Arkansas Secretary of State; and the amount in controversy exceeds $75,000 exclusive of interest and costs; 28 U.S.C. 1331, because it involves federal questions; and specifically, 15 U.S.C. §1692k(d). This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

3.        Venue is proper in the Eastern District of Arkansas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Faulkner County, which is in the Eastern District.

4.        In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail and interstate telephone communications.

**The Parties**

5.        Laura Lynn Hammett is an individual residing in Faulkner County, Arkansas. She is a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692a(3).

6.        Hammett was named Laura Lynn before her current marriage.

7.        Hammett lived in California for her first 53 years, except for 3 years when she studied journalism out of state. She kept the California phone number that she has owned since 2001.

8.        Separate Defendant Portfolio Recovery Associates, LLC is a Delaware Limited Liability Company with no registration in Arkansas. PRA is subject to specific personal jurisdiction in Arkansas, because it availed itself of the rights and duties of a citizen of Arkansas by instigating profuse communications with a citizen of Arkansas by telephone, with the intent to inflict emotional distress

through abusive debt collection practices and invade the privacy of the Arkansas citizen; and is licensed by the Arkansas State Board of Collection Agencies, subjecting it to long arm jurisdiction, A.K.A. § 17-24-401.

9.      PRA is in the principal business of purchasing debt from original creditors and collecting that consumer debt. It has been sued for unlawful debt collection practices in Arkansas. PRA is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

10.     PRA is liable for the acts of its employees by the theory of Respondeat Superior.

11.     Plaintiff does not know the true names, legal capacities or exact nature of the involvement of the separate Defendants sued herein as DOES 1-99, inclusive, and therefore sues said Defendants by such fictitious names.

12.     DOES 1-99 are believed to be employees and shareholders of PRA and may be named as individuals or in official capacities.

13.     PRA and DOES 1-99 are collectively referred to as "Defendants". For ease of reading, individual employees may be referred to by name, or their actions may be attributed to their employer, PRA.

**General Allegations**

14.      PRA made incessant, obnoxious phone calls to the Plaintiff with the intent of inflicting extreme emotional distress; a goal that was achieved.

15.      The abusive behavior was meant and did in fact coerce Plaintiff to be recorded against her will and share private information, the month and day of her birthday and an address with PRA that Plaintiff was not required legally to share.

16.      Plaintiff now has more anxiety that PRA and its employees will use the private recording and information for purposes as unethical and unlawful as the violations of statutes outlined below.

17.      PRA violated their obligations and Hammett's rights and inflicted emotional distress for the sole purpose of attempting to collect an alleged $2,297.63 debt that was allegedly incurred in or about 2001, that they allegedly purchased from a credit card company.


**Hammett's Glass Head**

18.      Plaintiff was raised by a bi-polar mother and was abused as a child.

19.      She developed several unhealthy relationships and Generalized Anxiety Disorder.

20.      Hammett believes about eight people have stalked since 2001.

21.      She has prosecuted six of her alleged stalkers with varying degrees of success.

22.     Hammett has represented herself in nine civil business disputes related to her real estate and construction business, the vast majority against entities that were represented by counsel. She prevailed on seven of these, one in Superior Court in California facing five separate law firms. Seven were as Plaintiff.

23.     Hammett taught herself law by reading and watching material on the internet.

24.     Every encounter in court is extremely stressful to Hammett.

25.     On July 3, 2020, Hammett learned there was a small claims suit filed against her in California, asking $10,000 in damages for a car accident that allegedly happened just under two years earlier. Two years would be the statute of limitations.

26.     Hammett was in California on business at the time of the accident, but she flew there, so did not have her car and was not involved in any collision.

27.     The car accident claimant was advised by a law firm that appears to be a lawsuit mill.

28.     Hammett mailed a draft malicious prosecution suit to the law firm, sent a letter to the Court and the suit was dismissed without prejudice. But that took several months, with the slow wheels of justice during the COVID pandemic.

29.     Stalkers and lawsuits are not an exhaustive list of stressors with which Plaintiff has dealt.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                                6

30.     Before 2015, Hammett was self-hospitalized twice for acute anxiety, depression and suicidal ideation.

31.     Plaintiff always took appropriate care of her mental health, practices yoga, is a devout Christian since 2002, eats healthfully, and exercises. She is just subjected to way too much stressful and inappropriate behavior.

32.     In early 2015, on the advice of her therapist, Plaintiff moved to a remote property in Arkansas. She was an hour and ten minutes from the nearest Wal Mart.

33.     For a year, she did not tell many from her past where she lived, not even her sons or her best friend. She told two lawyers. That is all.

34.     Plaintiff called her property PTSD, for Peace Tranquility Serenity Divinity.

35.     It worked like a charm and Hammett was living without any medication or therapy, just church and lots of exercise outdoors.

36.     Then in 2017 stressors began again.

37.     In 2018 Plaintiff moved to Faulkner County because her husband could not live at the remote property. Still, the Hammett's home is serene and private, with a wonderful view of nature.

38.     Unfortunately, Plaintiff had several stressors, including the bogus lawsuit against her and the COVID-19 pandemic that caused her to have what was diagnosed as an Adjustment Disorder. (In California she was diagnosed with

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                    7

Generalized Anxiety Disorder as per the Diagnostic and Statistical Manual of Mental Disorders.)

39.     In addition to the stressors listed above, maybe due to the stress in part, Hammett had several physical medical conditions that started in early 2018. She had acute back ache for several years. She tore both meniscuses. She had surgery on one knee, but the other surgery was cancelled due to COVID-19 concerns. Around November 2020 she got Adhesive Capsulitis, commonly called Frozen Shoulder Syndrome, an extremely painful ailment that has no magic cure. Her blood shows an alarming vitamin D deficiency. And she had an abnormal sleep apnea test and is scheduled for more testing with a sleep clinic.

40.     Because of the physical ailments, Hammett could not do her chosen work, which was restoring houses. She has been in construction and real estate her entire adult life and did the physical labor of "flipping" houses, along with her own legal work.

41.     Instead of investing in real estate, Hammett invested $575,000 of her own money into the stock market in what she termed "cockroaches", companies that would survive an atom bomb. She took advantage of small incremental changes in price. She borrowed the maximum allowed on margin (non-consumer debt) to increase her opportunity for profit.

42.     Hammett's strategy was to buy on bad news, usually when a stock dropped

about 10% at the opening bell, then hold until it came up above what she had paid.

If the stock continued to fall, Hammett bought more. Hammett noticed the same

thing as the Reddit investors who bought Game Stop stock, that hedge fund and

other big money managers were manipulating the market. Hammett took advantage

of perceived opportunities by following those big institutional investors on an

individual basis.

43.     Unfortunately, Hammett was holding about a quarter million dollars in

American Airlines Group stock when the market crashed in March 2020. When her

portfolio value fell to what she owed to the margin account plus $75,000, Hammett

sold everything. That was March 16, 2020. Half her net worth was wiped out.

44.     The last time in March 2020 that Hammett looked at her account, it did

not say there was a zero balance, as it should. It was a negative balance of about

$20,000. Hammett went in shock, closed the program, and did not log back into the

account for about nine months.

45.     Then Hammett received mail that said the bank account associated with

her trading account was closed for inactivity. She was just beginning to feel like

she could deal with the problem of the negative balance.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                    9

46.     Hammett called her broker and found that the balance was indeed zero, and the representative could not tell why there had been that moment where it showed as a negative.

47.     Luckily, the rest of Hammett's net worth was in real estate. Unfortunately, real estate is illiquid, and Hammett was not able to ready the properties she had for a profitable sale because of her physical ailments, stress and difficulty hiring tradespeople during the pandemic.

48.     Hammett and her husband had no consumer debt and did not want any.

49.     Mr. Hammett was tournament fishing full time in 2019 but had to start his construction company back up after the COVID pandemic started. He is extremely busy subcontracting to one particular company. He helps Laura Hammett as much as he can with her projects but needs to give first priority to the other company that gives an immediate income stream.

50.     Mr. Hammett has been the sole provider in the household ever since the market crash. Laura Hammett writes, but has not made any money from it just yet.

51.     The combination of stressors and physical ailments caused Hammett to have insomnia. It was difficult to fall asleep, and when she did, it was for only a few hours.

**PRA Begins Stalking Hammett in 2020**

52.     It is against this backdrop that PRA began making incessant phone calls to Hammett.

53.     The number PRA called is Hammett's cell phone.

54.     Hammett does not know when the calls began. She has not sent a subpoena for her phone record yet.

55.     Often PRA used a California number, but there were calls from several states.

56.     Sometimes when Hammett answered there would be a long silence and then a shift in tone, sounding like the calls were made from an auto-dialer. Occasionally, the call would drop before anyone spoke.

57.     Each time someone did speak they would say "This is [John Doe], calling from a recorded line."

58.     Hammett did not want to be recorded by an unknown caller. She would hang up and block the number.

59.     But she would receive another similar call from a different number the next day, sometimes twice per day.

60.     Hammett, even though it meant being recorded, occasionally demanded the caller not call her from a recorded line.

61.     Finally, around November 18, 2020, Hammett realized that the annoying telephone calls were not going to stop unless she spoke to the callers on a recorded line against her will.

62.     She estimates having received 120 calls from PRA.

63.     On November 18, 2020, Hammett spoke to PRA and also recorded the call. She made three more recordings after that. She let PRA know they were being recorded on each of these calls, even though they gave implied consent by recording the call themselves.

64.     When asked directly, the callers would tell Hammett that they were calling on behalf of "Portfolio Recovery Associates", but not what the call was about.

65.     Hammett does not remember when, but she eventually called one of the numbers that the annoying calls came from and the recording said PRA is a debt collector.

66.     Hammett conveyed to the caller on November 18, 2020 that she knew he was with a collection agency and he did not deny it.

67.     She told the caller specifically that he had the right Laura Lynn, and that he "verified" that. But the caller continued to demand Hammett answer questions before he would tell her what the alleged debt was. He demanded Hammett confirm her birthday so they could verify they were speaking to the correct "Laura Lynn" at the number they dialed to speak to Laura Lynn.

68.     It was so incredibly bizarre. PRA called Hammett and asked if she was Laura Lynn. Hammett said yes. Then PRA asked if her birthday was a specific date. If Hammett said yes, that would be no more verification than when she said "ya, you've verified it" to her name. PRA had already given the date.

69.     Hammett dreaded how many more personal facts she would be forced to confirm on a recorded line, basically a deposition, before this uninvited caller would tell her what rational he had for calling her.

70.     PRA did not inform Hammett that she could send a written request to find out the purpose of the calls.

71.     It seemed like the caller got bonuses depending on how many questions he could coerce Hammett into answering, without disclosing the alleged reason he had to call her in the first place.

72.     PRA said they thought Hammett was in California.

73.     California requires both parties to consent to recording. Technically, PRA employees did not commit a crime by calling Hammett on a recorded line, because she was not residing in California, but they did not know that. They flouted the law by recording someone they thought was in California, even after she had asked them not to and hung up on them repeatedly.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                          13

74.     Even if calling Hammett in a single party consent state, after the third, fourth or hundred-seventeenth time she hung up on them, PRA should have tried something else, or better yet, stopped altogether.

75.     The notification laws of the FDCPA do not specify that a request to cease communicating by phone must be made by the alleged debtor. Even if Hammett was not "Laura Lynn", PRA was required to stop calling her phone.

76.     In fact, a debt collector may call a third party for location information once. FDCPA § 804. But the collector may not make repeated calls. Id § 804(3)

77.     PRA never asked Hammett if she knew the location of Laura Lynn. They just demanded the party they called give her social security number, birthday and address. If PRA doubted that the woman they dialed who said she was Laura Lynn at the number that belonged to Laura Lynn was not the right Laura Lynn, then they should have treated the woman as a third party. They should have asked if the person they dialed knew the location of Laura Lynn, and then stopped calling.

78.     PRA was also in violation of the TCPA.

79.     Laura Lynn at the number they dialed was on the National Do Not Call Registry. Hammett told PRA she was on the registry. Hammett told PRA to stop calling that phone.

80.     On November 18, 2020, PRA told Hammett that they are not subject to the TCPA because they are not telemarketers.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                        14

81.     PRA is subject to the TCPA and they know they are because they have

been sued for violations of the TCPA. (see *Meyer v. Portfolio Recovery Assocs.,*

*LLC, 707 F.3d 1036 (9th Cir. 2012)* injunctive relief granted).


**How Plaintiff's Behavior Was Altered By the PRA Phone Calls**

82.     At first, Hammett was troubled by the calls because she did not know who

was stalking her. Hammett had stopped seeing a therapist a few months earlier but

started back.

83.     One possibility was that one of her previous stalkers was back at it.

Hammett felt nervous.

84.      It was possibly someone trying to collect the false deficit from Hammett's

stock account. Hammett felt mad and anxious. She had sold all her stock at a loss

against her policy and missed the opportunities when the market rebounded, just so

she would not lose all her money. Now she feared someone thought she owed

about $20,000.

85.     Plaintiff often speaks to lawyers and doctors on the phone. The PRA calls

would disrupt those calls, even if just for a few moments.

86.      Plaintiff has children she speaks with on the phone. She wants to be

available to them any time. But Hammett has insomnia and took naps whenever

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                           15

she could fall asleep. PRA disrupted several of those naps. So, Hammett had to turn off her phone and maybe miss a call from her beloved family.

87.     PRA would call after 9 p.m. in Hammett's time zone. This would disrupt her precious time when she was alone with her hard working, hard playing husband.

88.     After PRA refused to tell Hammett what her alleged debt was, she spent time filling out a request for her credit report online. Hammett could not get all the verification questions right, so she had to fill out a paper request for Equifax, make copies of her identification, add postage and go to the post office. (Hammett's rural mailbox is not very secure.)

89.     Hammett's credit report came back showing no credit extended, as she expected. Hammett was not sophisticated enough to know that debt collectors could try to collect debts that have already fallen off credit reports. She was extremely worried then that PRA was trying to collect on a non-existent debt.

90.     The calls did not slow down after November 18, 2020. In fact, Plaintiff began to document many of the calls and there were at least 29 more. Plaintiff took the time to call each of these unknown numbers back and each was from PRA.

91.     On February 18, 2021, Hammett told PRA her birthday, because that is the only way she could convince them to disclose what alleged debt Laura Lynn owed.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                        16

92.     Hammett also gave PRA an address to which they should mail any further communication. Hammett had already told the UPS Store where she had a PO Box that she was not going to renew it in April but had to change her mind so she would not have to give PRA her home address.

93.     Plaintiff will incur the cost of the PO Box until this matter is settled or adjudicated and any judgment paid.

94.     Hammett did not want to give personal information to a company who had not validated their ownership of an alleged debt that was too old to collect through court and had fallen off her credit report.

95.     Since PRA had no right to give Hammett interrogatories, they should not have coerced her to answer personal questions as a prerequisite to making their own required disclosures.


**PRA Continued to Violate the FDCPA After Plaintiff Told Them Her Address**

96.     As of March 10, 2021, PRA has not notified Plaintiff that she can write to them to request an address for the alleged original creditor and validation of the alleged debt.

97.     Hammett had to research debt collection practices to discover this right for herself.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                              17

98.    Hammett sent a seven-page letter to PRA about February 22, 2021 in which she made a settlement offer for their violations to that date.

99.    Hammett told PRA to keep the envelope for the postmark, because a snowstorm might delay when the letter written on February 20, 2021 could be put in the mail.

100.   Hammett did not say the specific words "I refuse to pay any debt" or "don't contact me in any way"; but did specify not to contact her electronically and not to contact anyone else about her in any way "unless through discovery for any suit I am forced to file against you."

101.   The settlement offer asked for "mutual release and no-contact orders for any related issues" and did not include any off-set for the alleged debt.

102.   It should have been clear to PRA that Hammett did not intend to pay any alleged debt and did not want to be contacted, except for purposes of settling or litigating Plaintiff's claims against PRA.

103.    Prior to this writing on March 10, 2021, PRA sent a single communication that arrived at Hammett's PO Box.

104.    On March 1, 2021 at about 9:13 a.m., Hammett called the UPS store and asked if there was any mail in her box. There is a note on the box that says to call Hammett if she gets mail, but Hammett was extremely concerned about PRA.

105.    There was no mail.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                                    18

106.    Hammett sent a certified letter to PRA on March 3, 2021 dated March 2, 2021 in which she wrote, inter alia, "It is two weeks later [after the February 18th conversation] and I have not received any correspondence from you."

107.    On March 4, 2021, Hammett went to the UPS store and found a letter from PRA in her box. The "associate lead" (manager) wrote a note that says she knows the letter did not arrive until at least March 2, 2021 because they went to a new system on March 1, 2021 to know who sorted the mail, and it was a new employee's mark on the envelope.

108.    The letter was in a standard #10 business envelope with a window. It had "presorted first-class mail U.S. postage paid cis" all capitalized, printed in the top right corner and no postmark.

109.    The enclosed letter was dated "02/19/2021". If the letter took five days to arrive and was delivered on March 2nd, it was not put in the mail until at least February 25, 2021. This was deception by PRA.

110.    It was more than five days after Hammett gave an address to PRA before they sent anything in writing.

111.    What PRA sent did not have the required disclosures pursuant to 15 U.S.C. § 1692g(a).

112.    What PRA sent was a letter that misstated the conversation Hammett had with their representative on February 18, 2021. They claimed they "understood"

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                                    19

that Hammett wished to dispute the account because she was a victim of identity theft or fraud.

113.     During the conversation Hammett said she had no debt. She repeated emphatically "I have no debt". Hammett did not mention identity theft or fraud.

114.     The PRA representative identified as Tabitha Voshears said "OK so we'll put it in a dispute for fraud for you...just a second..."

115.     Hammett did not respond to that statement. She thought Ms. Voshears meant the dispute was whether PRA committed fraud or not. Hammett had not called what PRA did "fraud" but could understand how PRA might think they were being accused of fraud. They have been accused of it numerous times before this.

116.   There is a bold notice at the bottom of the first page sent. It says:


**"This communication is from a debt collector. This communication is made for the limited purpose of responding to your dispute and is NOT an attempt to collect a debt."** (Capitalization of "NOT" theirs)

117.     This was another bizarre and deceptive statement by PRA. It is highly unlikely that if they were NOT trying to collect a debt, they would send a form for Hammett to fill out that divulged detailed personal information about herself.

118.     Reading through the forms PRA sent took more of Hammett's time and limited energy.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND INVASION OF PRIVACY, INTRUSION                    20

119.    Reading through the forms made Hammett think about a terrible time in her life, upsetting Hammett even more.

120.    Hammett felt compelled to send a response letter to PRA, so they would not try to claim Hammett agreed with them by her silence. So, Hammett spent more time writing the letter, driving to the post office and paid $7.00 to send it certified, return receipt.

121.    Hammett felt a lot of anger and sadness, knowing that PRA treats thousands of people this same way.

122.    The form sent by PRA looks official, like a legal process. It demands that the affiant sign in the presence of a notary or witness. Most people of average sophistication would probably think they were obligated to fill this paperwork out. Especially if PRA omitted notice that the alleged debtor could demand verification of the debt first, as PRA did to Hammett.


**Plaintiff Recalls Probable PRA Violations from 2014**

123.    After thinking about some of the distressing circumstances of her past, Hammett deduced that PRA made other unlawful efforts to collect a debt around 2014.

124.    In late 2014, a man named Michael Williams came to Hammett's boyfriend's store. She worked there also.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND INVASION OF PRIVACY, INTRUSION                    21

125.    Hammett had lived with Michael Williams from about 1997 to 2000. She broke up with Mr. Williams.

126.    Mr. Williams did not take the break-up well. Hammett had to cut ties with him completely, as he would show up to her real estate business and lay on the floor in fetal position crying over the break-up.  Hammett thinks she obtained a restraining order against him, but it would have expired by 2014.

127.    Mr. Williams acted in a similar way during this visit in 2014. But he said the reason he looked Plaintiff up is that he had numerous calls from "bill collectors" asking about her. He begged her to make them stop calling him. She said she did not know who the bill collectors were, and he could not be more specific. He said the callers would not identify themselves, but that they were looking for Laura Lynn because she owed money.

128.    It is more probable than not that the incessant calls Michael Williams described were made by PRA, and PRA told a third party that Plaintiff owed money that she refused to pay.

129.    After about 15 minutes of a rant where Mr. Williams professed his continued love for Plaintiff, peppered with demands to "pay your bills", Plaintiff had to leave the property herself to do some work. Mr. Williams was gone when she got back.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                           22

130.    The whole incident was extremely humiliating and distressing. PRA's refusal to tell Mr. Williams who they were is good cause to toll the statute of limitations for this action.

131.    Hammett is not able to locate Mr. Williams to ask if Portfolio Recovery Associates sounds familiar to any name the "bill collector" might have given. It is quite possible he has passed away.

132.    It is notable that Mr. Williams, a man of average intelligence, was able to find Plaintiff after almost 15 years after they broke up.

133.    If Mr. Williams could find Plaintiff, a debt collector with skip tracing capability could certainly find Plaintiff. Plaintiff does not know how many annoying hang-ups or unidentified caller calls she received back then.

134.    Because PRA backdated the one letter they mailed to Hammett, it is plausible PRA will alter or destroy evidence of their prior misdeeds, which makes litigation even more daunting to the pro se litigant.

*All facts stated in paragraphs 1 to 134 above are incorporated by reference to paragraphs into the claims as if stated therein.*

### First Claim for Relief: Violations of the FDCPA

135.    The Defendants' actions violate the FDCPA, including but not limited to:
COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                                    23

136.    Section 804.  "*Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall identify himself, state that he is confirming or correcting location information concerning the consumer, and, only if expressly requested, identify his employer; not state that such consumer owes any debt; and not communicate with any such person more than once unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information.*"

137.    The Defendants violated this by speaking to Mr. Williams enough to cause him to search out the Plaintiff and beg her to pay her bills.

138.    Section 805(a). "*Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt after 9:00 p.m.*"

139.    The Defendants violated this by calling Hammett after 9 p.m. in her local time.

140.    Section 804(c). "*If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not*

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                                          24

*communicate further with the consumer with respect to such debt, except*

*[exceptions not applicable].*"

141.   Hammett could have made PRA cease communicating when they first called

her if she knew they were a debt collector and knew their company name. PRA did

not give a meaningful identification and thus gave Hammett no way to contact

them in writing, until Hammett agreed to be recorded. Thus, PRA violated the

intent of the law.

142.   Hammett clearly asked PRA in writing to cease communications other than

for her claim against them in a letter sent about March 20, 2021. PRA sent a letter

on or after March 25, 2021 anyhow, deceptively backdated it, did not send it

certified or even post marked, and made an absurd statement that it was not in an

attempt to collect a debt.

143.   Section 806: "*A debt collector may not engage in any conduct the natural*

*consequence of which is to harass, oppress, or abuse any person in connection*

*with the collection of a debt.*"

144.   The Defendants violated this by contacting Hammett incessantly, coercing

her into speaking on a recorded line, and mailing an "affidavit" for Hammett to fill

out that brought up horrible events from the past that she did not want to think

about, even after she made it clear she was not going to pay them any money. The

legislature used the words "any person", not "the consumer" as in many other
COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                    25

clauses of the act. It is even worse that the Defendants were willing to harass someone they thought might be an innocent third party.

145.   Section 806(5): "*Without limiting the general application of the foregoing, the following conduct is a violation of this section: Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.*"

146.   The Defendants violated this by making about 120 calls to Hammett that Hammett refused to speak with them on.

147.   Section 807(10): "*A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:  The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.*"

148.   The use of the Affidavit was deceptive.

149.   The Legislature's language did not specify that the consumer be deceived. It specified that the communication may not be deceptive. Backdating the letter mailed sometime after February 25, 2021 was an attempt to deceive this Court and Jury.

150.   Section 807(11): "*The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.*"

151.   There is no exception if the person they dial refuses to be recorded or if the person they dial will not go through a verification process as if the consumer instigated the inquiry.

152.   Section 807(13): "*The false representation or implication that documents are legal process.*" The "Portfolio Recovery Associates, LLC Identity Theft Affidavit" sent by the Defendants requires a signature of a "notary" or "witness". "Affidavit", "Notary" and "Witness" would imply legal process to an unsophisticated consumer and even to a sophisticated consumer.

153.   Section 807(14): "*The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.*" PRA representatives said the company name is "Portfolio Recovery Associates" instead of "Portfolio Recovery Associates, LLC" several times, even after Hammett asked them directly if they were an "LLC". If PRA shareholders

want to hide behind the veil of a Delaware LLC, they must let the consumer know they are a limited liability company and their true and correct name.

154.   In fact, on the legal looking document the Defendants mailed, they write out their complete name and then shorten the name with a legal shorthand to "('PRA, LLC')". PRA must be just as forthcoming on their less legal sounding communications.

155.   Section 809(a)(3): "*Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing: a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector.*"

156.   PRA did not do this.

157.   Section 809(a)(4): "*a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector.*"

158.   PRA did not do this.

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                    28

159.   Section 809(a)(5): "*a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor.*"

160.   PRA did not do this.

**Second Claim for Relief: for Violations of the TCPA, 47 U.S.C. 277**

161.   PRA's actions violate the TCPA, including but not limited to: Section b(1)(A)(iii): "**It shall be unlawful for any person within the United States**, or any person outside the United States if the recipient is within the United States **to make any call (other than** a call made for emergency purposes or **made with the prior express consent of the called party**) using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a paging service, **cellular telephone service**, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States." (bold added)

162.   PRA made approximately 120 unwanted calls, despite plaintiff's pleas to cease and desist. The violations were made willingly, maliciously, with full knowledge that they were violating the law.

**Third Claim for Relief: Tortious Infliction of Emotional Distress, Outrage**

163.   The Defendants intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of their conduct.

164.   Any juror would hate to have PRA make these 120 phone calls to them. It was especially cruel when 33% of the population is reporting mental health issues and waiting with bated breath for a stimulus check.

165.   The Defendants backdated a letter. This caused cognitive dissonance in Plaintiff. It is reasonable for Plaintiff to believe PRA will do more deceptive acts in these proceedings.

166.   After receiving the letter mailed February 22, 2021, PRA had no right to mail anything, much less the prying "affidavit" to Plaintiff.

167.   PRA has not to date validated a debt from Plaintiff to them. If they cannot validate a debt, they had no right to make any communication.

168.   The Defendants' conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community". That is why the legislature enacted the FDCPA and the TCPA.

169.   Many people might have screamed, cussed, or cried if subjected to the same behavior. Plaintiff entered therapy, took pills and wrote this lawsuit, instead.

170.   The actions of the defendant were the cause of the plaintiff's distress.

171.     Plaintiff had several things contributing to her anxiety, but the Defendant takes the Plaintiff as they find her. Their actions were the tipping point.

172.     The emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. One call is a nuisance. Somewhere after two calls is unacceptable. 120 calls is beyond endurance. That is why Hammett finally succumbed and spoke to these reprehensible characters on a recorded line.

**Fourth Claim for Relief: Tortious Invasion of Privacy by Intrusion**

173.   PRA invaded Hammett's privacy by refusing to stop calling her unless she spoke on a recorded line.

174.   By calling Hammett repeatedly without meaningful identification, PRA forced Hammett to be taped in order to make the calls stop.

175.   It is true that the credit *reporting* agencies require verification of who is asking for information. But that is because the inquirer instigates the transaction.

176.   PRA instigated the transactions. PRA dialed the number that belonged to "Laura Lynn". Hammett answered the phone "Hi this is Laura" the first few times PRA called her. Hammett said she was "Laura Lynn".

177.   PRA had no legitimate purpose or right to demand the person they called tell her birthday.

178.   PRA had no legitimate purpose or right to demand Hammett to lend her voice to their recordings.

179.   There is a "safe-harbor" clause in the FDCPA so that if PRA told someone who verified she was "Laura Lynn" what the debt was and then found that it was not the right person, they would not be liable for damages.

180.   If PRA asked Hammett to allow them to record her to use for training purposes, Hammett would demand compensation of $10,000,000. PRA should have negotiated compensation before they made the tapes.

181.   Hammett's solitude is extremely important to her and PRA purposefully infringed upon it.

**Request For Jury**

182.   Plaintiff requests a jury of her peers rather than a bench trial. To alleviate some backup caused by the COVID-19 pandemic, Plaintiff requests the smallest jury allowed by Court rule or stipulation of the defendant.

**Request for Relief**

183.   Plaintiff requests that this Court:

   a) Enjoin Defendants from contacting Laura Lynn Hammett except through

      their counsel for purposes directly connected to this litigation;

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                                              32

b) Award actual damages as proven at trial and $1,000 statutory damages for violations of the FDCPA against PRA;

c) Award statutory damages of $1,500 per phone call for the number of phone calls a jury believes were made by PRA to Hammett for violation of the TCPA;

d) Award actual damages compensatory for the emotional distress caused by the Defendants, including PRA and DOES 1-99;

e) Award actual damages compensatory for the invasion of Hammett's privacy by the defendants, including $10,000,000 for recording her, from PRA and DOES 1-99 jointly and severally;

f) Award punitive damages against each defendant severally enough to deter them from continuing and repeating their actions against others and to punish them for harassing the Plaintiff with malice and complete disregard for her rights. Doe defendants need to know that their earning minimum wage or a fat executive salary is not a good rational for their obnoxious, annoying, and distressful policies and practices;

g) Award reasonable attorney fees and costs;

h) Award other relief as the Court deems just and proper.

Respectfully Submitted,

Laura Lynn Hammett
500 Amity Road, Suite 5B #306
Conway, Arkansas 72032
(760) 966-6000

Plaintiff in Pro Se

Dated March 10, 2021

Laura Lynn Hammett

VERIFICATION

I, Plaintiff Laura Lynn, state that the contents of the pleading above are true to my

knowledge, except as to those matters stated on information and belief, and as to

those matters, I believe them to be true.

Dated March 10, 2021

Laura Lynn Hammett, Plaintiff in Pro Se

COMPLAINT FOR STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT AND THE FAIR DEBT COLLECTION PRACTICES ACT; AND TORTS
OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, OUTRAGE AND
INVASION OF PRIVACY, INTRUSION                                  34