IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LAURA LYNN HAMMETT                                                    PLAINTIFF

v.                          Case No. 4:21-cv-00189-LPR

PORTFOLIO RECOVERY ASSOCIATES, LLC;
DOES 1–99                                                           DEFENDANTS

## CONSOLIDATED ORDER[1]

   *Pro se* Plaintiff Laura Lynn Hammett brings myriad federal and state law claims against Defendant Portfolio Recovery Associates, LLC ("PRA, LLC").[2]  Ms. Hammett alleges that PRA, LLC (1) violated numerous provisions of the Fair Debt Collection Practices Act, (2) violated the Telephone Consumer Protection Act, and (3) committed several torts under Arkansas law.[3]

   This Order addresses three pending motions.  First, the Court addresses PRA, LLC's Motion for Summary Judgment.[4]  The Court GRANTS this Motion.  Second, the Court addresses Ms. Hammett's Motion to Amend the First Amended and Supplemented Complaint.[5]  The Court GRANTS in part and DENIES in part this Motion.  Third, the Court addresses Ms. Hammett's Motion for Partial Summary Judgment.[6]  The Court DENIES this Motion.

---

[1]  The Court is issuing two versions of this Order.  The Court will file a redacted version on the public record.  The Court will file an unredacted version under seal.  Only Ms. Hammett, PRA, LLC, and PRA, LLC's counsel may view the unredacted version of this Order.  Neither party may share the unredacted version with anyone else or reveal the contents of the redacted information.  If there is an appeal in this matter, the unredacted version of this Order should be filed under seal with the Eighth Circuit, unless the Eighth Circuit concludes otherwise.

[2]  *See* First Am. & Suppl. Compl. (Doc. 6).

[3]  *See generally id.*

[4]  Def.'s Mot. for Summ. J. (Doc. 75).

[5]  Pl.'s Mot. to Am. (Doc. 33).

[6]  Pl.'s Mot. for Partial Summ. J. (Doc. 37).

## BACKGROUND[7]

In 2001, Ms. Hammett (then Laura J. Lynn) was living in California and opened a credit card account with Capital One Bank.[8]  The account number ended in -6049.[9]  In 2010, Ms. Hammett became delinquent on this account.[10]  As of April 7, 2011, Ms. Hammett was past due on seven monthly payments.[11]  The account balance was $1,916.05.[12]

On April 8, 2011, Capital One charged off the amount that Ms. Hammett owed on this account.[13]  The term "charge off" means "[t]o treat (an account receivable) as a loss or expense because payment is unlikely" or "to treat as a bad debt."[14]  There are companies, like PRA, LLC, that buy charged-off accounts from credit card companies.[15]  On November 19, 2013, PRA, LLC bought Capital One's "rights and interests in the -6049 account . . . ."[16]

---

[7]  On summary judgment, the Court recites the genuinely disputed facts in a light most favorable to the nonmoving party, including giving the nonmoving party all reasonable inferences from the facts.  *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016).  Of course, the Court also relies on undisputed facts.  Essentially, the Court considers the version of the facts most favorable to the nonmovant that a rational juror could find on this record.  Accordingly, the Court's factual recitation is only good for the summary judgment motions.  This case presents partially dueling motions for summary judgment.  For efficiency purposes, and to give Ms. Hammett every possible benefit, the Court has chosen to recite all genuinely disputed facts in the light most favorable to Ms. Hammett, including giving her the benefit of all reasonable inferences.

[8]  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶¶ 5–7; Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121); *see also* Hammett Dep. Vol. I (Doc. 164) at 80:4–12, 81:15–18.  Ms. Hammett's deposition was split between two days.  The Court cites the March 2, and March 24, 2022 portions of Ms. Hammett's deposition as Volume I ("Vol. I") and Volume II (Vol. II), respectively.  The Court uses the pagination from the transcripts.  PRA, LLC filed a redacted version of Ms. Hammett's deposition on the public record and an unredacted version under seal.  When the Court cites a redacted portion of Ms. Hammett's deposition, the Court will cite both versions of Ms. Hammett's deposition.

[9]  Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121); *see also* Ex. 1 to Def.'s Notice of Suppl. Authority (Doc. 106-1) at 3.

[10]  *See* Ex. 1 to Def.'s Notice of Suppl. Authority (Doc. 106-1) at 3, 5 (April 7, 2011 account statement stating that the account is "7 payments past due").

[11]  *Id.*

[12]  *Id.* at 3.

[13]  Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121).

[14]  *Charge Off*, *Black's Law Dictionary* (11th ed. 2019).

[15]  *See* Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 6 (discussing information PRA, LLC receives when it buys accounts from Capital One).

[16]  *Id.* ¶ 9.

As part of this purchase, Capital One transmitted to PRA, LLC "load data" associated with the account.[17]  Load data provides specific details about an account that a company like PRA, LLC buys from Capital One.[18]  The load data that Capital One provided to PRA, LLC with respect to account number -6049 contained personal information about Ms. Hammett.[19]  It listed Ms. Hammett's prior name, Laura J. Lynn.[20]  It listed an address at which Ms. Hammett briefly lived, 5757 Erlanger Street, San Diego, California 92122-3801.[21]  The load data listed Ms. Hammett's cell phone number that ends in -6000 and has an area code geographically tied to southern California.[22]  The load data also listed Ms. Hammett's birthdate and social security number.[23]  According to the load data, the charge-off amount was $1,916.05 and the post-charge-off interest amount was $381.58.[24]  These amounts resulted in a "current total balance" of $2,297.63.[25]  The instant case arises from PRA, LLC's attempt to collect this amount.

On December 3, 2013, PRA, LLC mailed a letter to Ms. Hammett addressed to 5757 Erlanger Street, San Diego, California 921223801.[26]  The letter stated that PRA, LLC had

---

[17]  *Id.* ¶¶ 6–7; *see also* Ex. B to Ex. 1 to Def.'s Statement of Facts (Doc. 78-5) (Under Seal at Doc. 121) (indicating that Capital One transferred to PRA, LLC records of individual accounts); Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121).

[18]  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 7.

[19]  Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121).

[20]  *Id.*; *see also* Hammett Dep. Vol. I (Doc. 164) (Under Seal at Doc. 166) at 78:4–8 (Ms. Hammett acknowledging that her name used to be Laura J. Lynn).

[21]  Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121); *see also* Hammett Dep. Vol. I (Doc. 164) at 78:9–12 (Ms. Hammett acknowledging she lived at 5757 Erlanger for two nights).

[22]  Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121); *see also* Hammett Dep. Vol. I (Doc. 164) at 78:24–79:1; *see also* Hammett Aff. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) ¶ 42 (Ms. Hammett stating that the area code for her -6000 number is 760, which "covers Southeastern California and North San Diego County, which is Southwest California").

[23]  Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121); *see also* Hammett Dep. Vol. I (Doc. 164) at 79:5–7.

[24]  Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121).

[25]  *Id.*

[26]  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 28; *see also* Ex. F. to Ex. 1 to Def.'s Statement of Facts (Doc. 78-28) at 2.  As discussed below, the zip code was not properly hyphenated.

purchased the -6049 account from Capital One.[27]  The letter stated that the amount of the debt was $2,297.63.[28]  The letter told Ms. Hammett that (1) she had thirty days to inform PRA, LLC that she wanted to dispute the debt, and (2) if she did not do so, PRA, LLC would consider the debt valid.[29]

PRA, LLC also tried to contact Ms. Hammett by phone.[30]  On December 8, 2013, PRA, LLC called Ms. Hammett's phone number ending in -6000.[31]  Ms. Hammett did not answer.[32]  PRA, LLC did not leave a message.[33]  On December 12, 2013, PRA, LLC called the -6000 number again.[34]  Ms. Hammett answered but did not identify herself.[35]  PRA, LLC asked if Ms. Hammett

---

See *supra* p. 5.  It appears that PRA, LLC used another company, Compumail, to facilitate the dispatch of the letter. *See* Ex. E to Ex. 1 to Def.'s Statement of Facts (Doc. 78-8) (Under Seal at Doc. 121) at 5.

[27]  Ex. F. to Ex. 1 to Def.'s Statement of Facts (Doc. 78-28) at 2.

[28]  *Id.*

[29]  *Id.*

[30]  ▓▓▓▓▓▓▓▓▓▓ Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 36. ▓▓▓▓▓▓▓▓▓▓ Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 32; Ex. H to Ex. 1 to Def.'s Statement of Facts (Doc. 78-11) (Under Seal at Doc. 121) at 22. ▓▓▓▓▓▓▓▓▓▓ Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 33; Ex. H to Ex. 1 to Def.'s Statement of Facts (Doc. 78-11) (Under Seal at Doc. 121) at 22–23. ▓▓▓▓▓▓▓▓▓▓ Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 34; Ex. H to Ex. 1 to Def.'s Statement of Facts (Doc. 78-11) (Under Seal at Doc. 121) at 23. ▓▓▓▓▓▓▓▓▓▓ Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 34; Ex. H to Ex. 1 to Def.'s Statement of Facts (Doc. 78-11) (Under Seal at Doc. 121) at 23. ▓▓▓▓▓▓▓▓▓▓ Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 36.  As will be discussed below, these processes are not full proof.  In this case, for example, there are two occasions in which Ms. Hammett was called after 9:00 p.m. Central Standard Time. *See infra* at pp. 13–15.

[31]  Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 7.

[32]  *See id.* (stating that the call went to an answering machine).

[33]  *See id.* (stating that PRA, LLC did not leave a message).

[34]  *Id.*

[35]  Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 10.

was available.[36]  Ms. Hammett said, "No this is the estate sale.  It's a business."[37]  PRA, LLC

apologized and asked if Ms. Hammett worked at the business.[38]  Ms. Hammett did not answer

PRA, LLC's question.[39]  Instead, the call abruptly ended.

On December 18, 2013, PRA, LLC learned that the December 3, 2013 letter was returned

as undeliverable because of a zip-code error in the address.[40]  On December 19, 2013, PRA, LLC

changed the address's "zip code from '921223801' to '92122-3801,' and immediately resent the

same letter."[41]  On February 5, 2014, PRA, LLC sent another letter to the same address.[42]  This

letter, too, contained information concerning PRA, LLC's purchase of the debt and Ms. Hammett's

options on responding to the debt.[43]  The letters sent on December 19, 2013, and February 5, 2014,

were not returned as undeliverable.[44]  Ms. Hammett "did not request validation of her debt—or

---

[36]  Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107-6) at 3.

[37]  Hammett Dep. Vol. I (Doc. 164) at 23:8; *see also* Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107-6) at 3.

[38]  Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107-6) at 3.

[39]  *Id.*

[40]  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 28; Ex. E to Ex. 1 to Def.'s Statement of Facts (Doc. 78-8) (Under Seal at Doc. 121) at 5.  Throughout Ms. Hammett's Response to Defendant's Statement of Facts, Ms. Hammett offers blanket denials without pointing to any record facts. *See, e.g.*, Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 28.  On summary judgment, Ms. Hammett cannot rely on such denials to raise a genuine dispute of material fact.  Rather, she must point to record facts to support her denials.  Where she fails to do so, the law directs the Court to treat her unsupported denials as an admission. *See* Fed. R. Civ. P. 56(e)(2) (stating that, "if a nonmovant . . . fails to properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion" for summary judgment); *see also Ruby v. Springfield R–12 Pub. Sch. Dist.*, 76 F.3d 909, 911 (8th Cir. 1996) ("[A] nonmoving party cannot rest on denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial.").  The Court will not flag every time Ms. Hammett has failed to address PRA, LLC's assertions of facts.  Nevertheless, this legal point applies to all of Ms. Hammett's unsupported denials.

[41]  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 28; Ex. E to Ex. 1 to Def.'s Statement of Facts (Doc. 78-8) (Under Seal at Doc. 121) at 5.

[42]  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 28; Ex. E to Ex. 1 to Def.'s Statement of Facts (Doc. 78-8) (Under Seal at Doc. 121) at 5; Ex. F to Ex. 1 to Def.'s Statement of Facts (Doc. 78-28) (Under Seal at Doc. 121) at 2–3.

[43]  Ex. F to Ex. 1 to Def.'s Statement of Facts (Doc. 78-28) (Under Seal at Doc. 121) at 3.

[44]  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 28.

otherwise respond [to the letters] in any way, ever, because [unbeknownst to PRA, LLC] she did not receive the letters."[45]

After PRA, LLC was told the -6000 phone number associated with Ms. Hammett's account was a business number, PRA, LLC did not call that number again for nearly seven years.[46]  PRA, LLC did, however, call other numbers in reference to Ms. Hammett's debt.[47]  From March 24, 2014, through July 14, 2015, PRA, LLC made twenty-nine calls to a phone number ending in -3337.[48]  PRA, LLC did not reach Ms. Hammett with any of these calls.[49]

In 2015, Ms. Hammett moved from California to a cabin in Witts Springs, Arkansas.[50]  Ms. Hammett "intentionally did not disclose to most people she was moving from California to

---

[45]  Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 29; Hammett Dep. Vol. I (Doc. 164) at 65:10.

[46]  *See* Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1–7 (showing that PRA, LLC did not call the -6000 number between December 12, 2013, and November 20, 2020).

[47]  *Id.*

[48]  *Id.* at 7.  The record does not reveal who owned this phone number.

Ms. Hammett says that, in 2014, PRA, LLC also called a phone number ending in -8660 and spoke with Ms. Hammett's former fiancé, Michael Williams, about Ms. Hammett's debt.  *See, e.g.*, Aff. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) ¶ 35 (Ms. Hammett saying that, in late 2014, Michael Williams told her that a debt collector "kept calling him about a debt"); Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 11 (Ms. Hammett saying that "Michael Williams, who appears to be deceased, told [Ms.] Hammett that he received several calls to his number ending -8660 from debt collectors in 2014").  PRA, LLC presents evidence, in the form of a phone log, that shows PRA, LLC did not call a number ending in -8660 during 2014.  Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal) at 7.  By sworn declaration, PRA, LLC asserts that it has never spoken with Mr. Williams.  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal) ¶ 21.  In response, Ms. Hammett presents bare denials and her own testimony about what Mr. Williams told her.  Bare denials do not cut it on summary judgment.  And the statements that Mr. Williams allegedly made to Ms. Hammett "are unsworn and made out of court, so they're inadmissible for summary judgment purposes."  *Glover v. Bostrom*, 31 F.4th 601, 605 (8th Cir. 2022).  While the Court reviews "the record in the light most favorable to [Ms. Hammett] as the non-moving party," the Court does "not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay."  *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001).  This means that PRA, LLC's factually supported assertion that it did not call Mr. Williams in 2014 is unchallenged and thus not the subject of a genuine dispute.

[49]  *See* Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 7 (showing that PRA, LLC reached an "Answering Machine/Voice Mail," had "No Contact," or spoke with a "Third Party").  PRA, LLC did not call any numbers associated with Ms. Hammett's account between July 15, 2015, and March 13, 2017.  *Id.* at 6–7.

[50]  *See* Hammett Dep. Vol. I (Doc. 164) at 17:20–21; Aff. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) ¶ 8.

Arkansas."[51]  At the cabin, Ms. Hammett had a landline ending in -2653.[52]  PRA, LLC somehow

learned of this phone number.[53]  Between March 13, 2017, and March 2, 2018, PRA, LLC called

the -2653 number forty-four times.[54]  Most of these calls went unanswered.[55]  Some didn't.  On

April 6, 2017, for example, an unidentified person answered PRA, LLC's call.[56]  The PRA, LLC

representative explained that "[t]his is Cindy Graham calling on a recorded line for Laura Lynn."[57]

The call recipient asked Ms. Graham, "Who are you with?"[58]  Ms. Graham said she was "calling

from Portfolio Recovery Associates."[59]  The call recipient said, "We don't accept any recorded

calls on this line."[60]  That person also told the PRA, LLC representative to destroy any recording.[61]

The PRA, LLC representative said, "Okay.  Ma'am, I don't know who I am speaking to.  So you

have a wonderful day."[62]

---

[51]  Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 33.

[52]  Hammett Dep. Vol. I (Doc. 164) at 17:16–21; *see also* Ex. cc to Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) at 1 (showing a phone bill addressed to Laura Lynn related to a telephone number ending in -2653 and an address at 9985 Lick Fork Road, Witts Springs, Arkansas 72686).

[53]  Although PRA, LLC learned that this number may be associated with Ms. Hammett in 2017, it is unclear from the record whether PRA, LLC knew in 2017 that the number and Ms. Hammett were associated with a particular address in Witts Springs, Arkansas.  The record does show that, on September 18, 2019, PRA, LLC obtained information suggesting that Ms. Hammett was associated with an address in Witts Springs, Arkansas.  Ex. E to Ex. 1 to Def.'s Statement of Facts (Doc. 78-8) (Under Seal at Doc. 121) at 6.  And on November 1, 2019, PRA, LLC made a soft-credit inquiry with respect to Ms. Hammett, which might have included information linking Ms. Hammett to the Witts Springs address.  *See* Ex. ff to Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) at 6.

[54]  Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 6–7.

[55]  *Id.*

[56]  Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 5.

[57]  *Id.*

[58]  *Id.*; Ex. 15 (Apr. 6, 2017 Audio Recording) to Pl.'s Mot. to Compel (Under Seal at Doc. 100).

[59]  Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 5.

[60]  *Id.*

[61]  *Id.*

[62]  *Id.*

On August 24, 2017, PRA, LLC had another brief conversation with an unidentified person on the other end of the -2653 line.[63]  Here's what was said:

> [Recipient]: Hello.
>
> [Caller]: Yes, hi.  This is Whitney Hodge calling on a recorded line for Laura Lynn. Is he or she available?
>
> [Recipient]: She won't be here until September 11th.
>
> [Caller]: You said she's not available?
>
> [Recipient]: Yes.
>
> [Caller]: Okay.  Thank you.
>
> . . . .[64]

On a few other calls, someone answered, a PRA, LLC representative stated his or her name, the representative said that he or she was calling on a recorded line, and then the call abruptly ended.[65] Ms. Hammett does not recall ever speaking with PRA, LLC on any of these calls.[66]  Ms. Hammett moved out of the Witts Springs cabin in February of 2018.[67]

Between March 9, 2018, and May 4, 2018, PRA, LLC called two phone numbers associated with Ms. Hammett's account.[68]  PRA, LLC made twenty-six calls to a landline ending in -8660.[69] At some point in time, Ms. Hammett shared this landline with her former fiancé, Michael

---

[63]  *Id.* at 7.

[64]  *Id.* at 7; *see also* Ex. 15 (Aug. 24, 2017 Audio Recording) to Pl.'s Mot. to Compel (Under Seal at Doc. 100).

[65]  *See, e.g.*, Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 6, 8.

[66]  *See* Aff. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) ¶ 9 (Ms. Hammett stating that, as of March 10, 2021, she did not know that PRA, LLC had called the Witts Springs number).

[67]  *Id.* ¶ 10.

[68]  Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal) at 5–6.

[69]  *Id.*

Williams.[70]  PRA, LLC also called the -2653 number (the Witts Springs cabin landline) thirteen times.[71]  PRA, LLC did not make contact with anyone at either number.[72]

Between May 5, 2018, and March 7, 2020, PRA, LLC called two phone numbers associated with Ms. Hammett's account.[73]  PRA, LLC called a phone number ending in -6822 once.[74]  Ms. Hammett does not recall this phone number.[75]  PRA, LLC called the -2653 number (the Witts Springs cabin landline) 120 times.[76]  PRA, LLC did not communicate with Ms. Hammett through these calls.[77]

Between March 10, 2020, and November 17, 2020, PRA, LLC called three phone numbers associated with Ms. Hammett's account.[78]  PRA, LLC called the -2653 number (the Witts Springs cabin landline) 141 times.[79]  PRA, LLC called a phone number ending in -1148 once and a phone number ending in -1644 once—a total of two calls.[80]  The -1644 number did not belong to Ms. Hammett.[81]  Ms. Hammett is unfamiliar with the number ending in -1148.[82]  PRA, LLC did not speak with anyone on the calls made to these phone numbers.[83]

---

[70]  Aff. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) ¶ 36.  In her deposition, Ms. Hammett testified that the -8660 number may have been registered only in Mr. Williams's name.  Hammett Dep. Vol. I (Doc. 164) at 16:19–17:4.

[71]  Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal) at 5–6.

[72]  *Id.*

[73]  *Id.* at 4–5.

[74]  *Id.* at 5.

[75]  Hammett Dep. Vol. I (Doc. 164) at 20:13–14.

[76]  Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 4–5.

[77]  *Id.*

[78]  *Id.* at 1–3.

[79]  *Id.*

[80]  *Id.* at 2.

[81]  Hammett Dep. Vol. I (Doc. 164) at 20:5–7.

[82]  *Id.* at 20:8–12.

[83]  Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1–3.  Most of PRA, LLC's evidence regarding phone calls comes from its phone log.  *See id.* at 1–7.  Ms. Hammett asserts that PRA, LLC's phone log is unreliable.  Specifically, Ms. Hammett says PRA, LLC's phone log is missing fifteen calls PRA, LLC

On November 18, 2020, PRA, LLC (for the first time since December of 2013) called Ms. Hammett's phone number ending in -6000.[84]  Ms. Hammett picked up.[85]  Ms. Hammett recorded the call.[86]  At the beginning of the call, PRA, LLC informed Ms. Hammett that it was calling on a recorded line.[87]  PRA, LLC said it was calling for Laura Lynn and asked if Ms. Hammett "want[ed] the name of the company."[88]  Ms. Hammett said, "Yes, please."[89]  PRA, LLC identified itself as "Portfolio Recovery Associates."[90]  Ms. Hammett then told PRA, LLC that it was speaking with

---

made to her phone number ending in -6000 between August 18, 2020, and October 30, 2020.  Aff. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) ¶¶ 24–26.  Ms. Hammett relies on her cellphone provider's records to identify calls from various phone numbers that "were probably from" PRA, LLC. *Id.*  Ms. Hammett says that these calls "fit the pattern" of phone calls she received from PRA, LLC. *Id.* ¶ 25.  Ms. Hammett describes the pattern as her receiving incoming calls lasting one minute from unknown phone numbers that were no longer in service. *Id.*  She says she called some of the phone numbers on PRA, LLC's log and learned that they were also no longer in service. *Id.*  With respect to the content of the calls, Ms. Hammett says that the callers spoke with the same cadence as PRA, LLC callers.  Hammett Dep. Vol. II (Doc. 164) at 36:24–25.  She also says that the callers used the same exact script as PRA, LLC. *Id.* at 36:25–37:5.  According to Ms. Hammett, the callers would say something like "[t]his is Joe Smith on the recorded line for Laura Lynn." *Id.* at 34:1–2.

Ms. Hammett is relying on rank speculation in the place of facts.  Ms. Hammett admits that she has no personal recollection of any of these calls. *Id.* at 33:18.  Ms. Hammett admits that no caller ever self-identified as a PRA, LLC representative. *Id.* at 36:17–20.  Ms. Hammett admits that she did not even try to call these numbers back until after she got her phone records (on February 20, 2022, almost a year and a half after the phone calls were made).  *See id.* at 34:15–20 (Ms. Hammett saying that she called the fifteen numbers after she got her cellphone records); Hammett Dep. Vol. I (Doc. 164) at 31:21–22 (Ms. Hammett stating that she got her cellphone records on February 20, 2022).  Finally, Ms. Hammett admits that these calls could have come from other people.  Hammett Dep. Vol. II (Doc. 164) at 38:19–20.  Ms. Hammett cannot rely on this speculation to raise a genuine dispute of material fact with respect to the accuracy of PRA, LLC's phone log.  Moreover, PRA, LLC has filed a sworn declaration stating that none of the phone numbers Ms. Hammett believes PRA, LLC called from during this time period was owned by PRA, LLC.  Ex. 3 to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107-3) ¶¶ 5–6.  The declaration also says that PRA, LLC never called the -6000 number on the dates Ms. Hammett says it did. *Id.*

[84]   Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[85]   *See* Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 12.

[86]   Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107-6) at 20.

[87]   *Id.* at 14; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[88]   Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 14; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[89]   Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 14; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[90]   Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 14; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

"Laura."[91]  PRA, LLC said it wanted to make sure it was calling "the correct Ms. Lynn."[92]  PRA, LLC told Ms. Hammett a birthdate and asked if it was her birthdate.[93]  Ms. Hammett said she wanted more information about PRA, LLC before giving personal information about herself.[94]  PRA, LLC told Ms. Hammett it was calling in "regards to a personal business matter" and "to continue, [PRA, LLC] would have to verify" that it was talking to the right Ms. Lynn.[95]

Ms. Hammett responded by asking PRA, LLC's name and asked if PRA, LLC was "an LLC or a corporation."[96]  PRA, LLC first said it was a company and, upon further questioning from Ms. Hammett, then said it was an LLC.[97]  Next, PRA, LLC and Ms. Hammett reached an impasse, with Ms. Hammett asking what the call was about and PRA, LLC saying that it could not provide further details unless it was sure it was speaking with the right person.[98]  Then Ms. Hammett told PRA, LLC that "[w]hatever this is about, please send me a letter and don't use this phone number."[99]  PRA, LLC said it could not do that because Ms. Hammett had not "verified" that she was the correct "Laura Lynn."[100]  Ms. Hammett repeated her request that PRA, LLC not

---

[91] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 14; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[92] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 15; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[93] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 15; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[94] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 15; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[95] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 15; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[96] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 15; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[97] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 15; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[98] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 15–18; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[99] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 19; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[100] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 19; *see also* Ex. 15 (Nov. 18,

call her phone number because she was "on the do-not-call list."[101]  PRA, LLC told Ms. Hammett

that it did not have a do-not-call list because it was not a telemarketer.[102]  Ms. Hammett then asked

PRA, LLC if it was "allowed to make a collections call even if the person asks you not to and to

put it in writing?"[103]  PRA, LLC told Ms. Hammett that she could send PRA, LLC "a cease and

desist" as she saw fit.[104]

Between November 29, 2020, and January 26, 2021, PRA, LLC called the -6000 number

thirty-one times.[105]  Some calls were answered.  Some were not.  On most of the calls that were

answered, the person who answered hung up immediately after PRA, LLC said it was calling on a

recorded line for "Laura Lynn."[106]  On December 9, 2020, however, a more substantive call

occurred.[107]  PRA, LLC called the -6000 number.[108]  Ms. Hammett answered.[109]  PRA, LLC told

Ms. Hammett that it was "calling on a recorded line for Laura Lynn."[110]  Ms. Hammett did not

identify herself and asked who was calling.[111]  PRA, LLC identified itself as "Portfolio Recovery

---

2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[101] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 20; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[102] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 20; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[103] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 20; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[104] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 20; *see also* Ex. 15 (Nov. 18, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[105] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[106] *See, e.g.*, Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 26, 27, 31, 32, 33, 34, 38, 40, 41; *see also* Ex. 15 (Audio Recordings) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[107] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1; *see also* Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 25; Ex. 15 (Dec. 9, 2020 Audio Recording) to Pl.'s Mot. to Compel (Under Seal at Doc. 100).

[108] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[109] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 17.

[110] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 25; Ex. 15 (Dec. 9, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[111] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 25; Ex. 15 (Dec. 9, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

Associates."[112]  Ms. Hammett said that she had asked PRA, LLC "not to call this telephone number" and "to put anything that" PRA, LLC had to say "in writing."[113]  Ms. Hammett then said "thank you" before hanging up.[114]

A similar call occurred on December 16, 2020.  PRA, LLC called the -6000 number.[115] Ms. Hammett answered but did not identify herself.[116]  PRA, LLC said it was "calling on a recorded line for Laura Lynn."[117]  Ms. Hammett told PRA, LLC to "delete the recording" and that PRA, LLC had "no permission to record" the call.[118]

On January 28, 2021, PRA, LLC called the -6000 number.[119]  Nobody answered.[120]  This call is fairly important to the case.  It is one of two calls that occurred outside the statutorily prescribed window for collection calls—the approved window being between 8:00 a.m. and 9:00 p.m. in the time zone at the debtor's location.[121]  On the date of the call, Ms. Hammett was living in Arkansas.  Arkansas is on Central Standard Time.[122]  The call came in at 9:19 p.m. Central

---

[112] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 25; Ex. 15 (Dec. 9, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[113] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 25; Ex. 15 (Dec. 9, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[114] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 25; Ex. 15 (Dec. 9, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[115] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 28; Ex. 15 (Dec. 16, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[116] Hammett Dep. Vol. I (Doc. 164) at 45:14–24 (Ms. Hammett saying she had a discussion with PRA, LLC on December 16, 2020); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 28–29.

[117] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 28; Ex. 15 (Dec. 16, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[118] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 28; Ex. 15 (Dec. 16, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[119] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[120] *Id.*

[121] *See* 15 U.S.C. § 1692c(a)(1) (stating that a debt collector "may not communicate with a consumer" at an unusual time and that a "debt collector shall assume that the convenient time for communicating with a consumer is after [8:00 a.m.] and before [9:00 p.m.], local time at the consumer's location").

[122] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 35.

Standard Time.[123]  The -6000 number had a California area code.[124]  California is on Pacific Standard Time.  The call came in at 7:19 p.m. Pacific Standard Time.

On January 29, 2021, PRA, LLC called the -6000 number.[125]  Someone answered.[126]  After PRA, LLC said it was calling on a recorded line for Laura Lynn, whoever answered ended the call.[127]  Then, on February 1, 2021, PRA, LLC called the -6000 number.[128]  Ms. Hammett answered but did not identify herself.[129]  PRA, LLC said it was calling on a recorded line for Laura Lynn.[130]  Ms. Hammett told PRA, LLC to wait a moment, and then PRA, LLC disconnected the call.[131]

Immediately following the termination of that call, Ms. Hammett called PRA, LLC back.[132]  Ms. Hammett did not identify herself.[133]  She did say that she owned the -6000 number.[134]  Ms. Hammett asked PRA, LLC not to call the -6000 number on a recorded line.[135]  Ms. Hammett asked

---

[123] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.  PRA, LLC's phone log lists times based on Eastern Standard Time.  Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 28.

[124] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 34.

[125] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[126] *Id.*; *see also* Ex. 15 (Jan. 29, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[127] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1; *see also* Ex. 15 (Jan. 29, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[128] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[129] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 44; Ex. 15 (Feb. 1, 2021 (file ending in 3631) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); *see also* Hammett Dep. Vol. I (Doc. 164) at 43:2–13 (Ms. Hammett saying she spoke with PRA, LLC on February 1, 2021).

[130] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 44; Ex. 15 (Feb. 1, 2021 (file ending in 3631) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[131] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 44; Ex. 15 (Feb. 1, 2021 (file ending in 3631) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 17.

[132] Hammett Dep. Vol. I (Doc. 164) at 43:2–6; *see also* Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 45–49.

[133] Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 45–46.

[134] Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 45.

[135] Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex.

14

for that number to be removed from PRA, LLC's calling list because it was on "the do-not-call list."[136]  PRA, LLC told Ms. Hammett that PRA, LLC does not "actually have a do-not-call list."[137]  PRA, LLC acknowledged that it was possible that PRA, LLC was trying to reach the wrong person.[138]  PRA, LLC said that the -6000 number did register in the system and that it could mark it as a wrong number if PRA, LLC could verify to whom it was speaking.[139]  Ms. Hammett did not identify herself or otherwise verify her identity.[140]

On February 2, 2021, PRA, LLC called Ms. Hammett's -6000 number.[141]  Nobody answered.[142]  This is the second call that occurred outside the statutorily prescribed window for collection calls.[143]  On the date of the call, Ms. Hammett was living in Arkansas.  Arkansas is on Central Standard Time.[144]  The call came in at 9:14 p.m. Central Standard Time.[145]  The -6000 number had a California area code.[146]  California is on Pacific Standard Time.  The call came in at 7:14 p.m. Pacific Standard Time.

---

6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 45.

[136] Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 45–46.

[137] Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 47.

[138] Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 47.

[139] Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 47–48.

[140] Ex. 15 (Feb. 1, 2021 (file ending in 9669) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal); Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 44–49.

[141] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[142] *Id.*

[143] *See* 15 U.S.C. § 1692c(a)(1) (stating that a debt collector "may not communicate with a consumer" at an unusual time and that a "debt collector shall assume that the convenient time for communicating with a consumer is after [8:00 a.m.] and before [9:00 p.m.], local time at the consumer's location").

[144] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 35.

[145] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[146] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 34.

On February 4, 2021, PRA, LLC called the -6000 number.[147]  Nobody answered.[148]  On February 9, 2021, PRA, LLC called the same number.[149]  Someone picked up and quickly ended the call after a PRA, LLC representative said that he or she was calling on a recorded line for Laura Lynn.[150]  Between February 10, 2021, and February 15, 2021, PRA, LLC called the -6000 number four times.[151]  PRA, LLC did not communicate with anyone on these calls.[152]  On February 16, 2021, PRA, LLC called the -6000 number.[153]  Someone answered and quickly ended the call after a PRA, LLC representative said that he or she was calling on a recorded line for Laura Lynn.[154]  On February 17, 2021, PRA, LLC called the -6000 number but did not speak with anyone on the call.[155]  This is the last phone call that PRA, LLC made to any numbers associated with Ms. Hammett's account.

On February 18, 2021, Ms. Hammett called PRA, LLC.[156]  Ms. Hammett spoke with a PRA, LLC representative named Tabitha Boshears.[157]  Ms. Hammett told Ms. Boshears that her name was Laura and that PRA, LLC had her last name listed as Lynn.[158]  Ms. Hammett then

---

[147] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[148] *Id.*

[149] *Id.*

[150] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 52; Ex. 15 (Feb. 9, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[151] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[152] *Id.*

[153] *Id.*

[154] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 54; Ex. 15 (Feb. 16, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[155] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1.

[156] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 55; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[157] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 55; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[158] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 55; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

remarked on her receiving multiple calls from PRA, LLC and asked Ms. Boshears about the debt PRA, LLC was allegedly trying to collect.[159]  Ms. Boshears indicated that she saw "something with the name" Ms. Hammett provided.[160]  Ms. Boshears asked Ms. Hammett to verify her identity.[161]  Ms. Hammett provided her birth date.[162]  Ms. Boshears "thereafter disclosed [that PRA, LLC] was a debt collector."[163]

Ms. Boshears told Ms. Hammett that the debt related to a "Capit[a]l One Mastercard."[164] Ms. Boshears then began to give Ms. Hammett payment options.[165]  Ms. Hammett interrupted Ms. Boshears, saying she did not need payment options because she did not owe any money.[166]  Ms. Hammett said she was not familiar with the Capital One account.[167]  Ms. Hammett said that PRA, LLC ran her credit report on November 1, 2019, and knew that Ms. Hammett had no debt.[168]  Ms. Hammett then said that she didn't "want any more phone calls or electronic communication."[169]

---

[159] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 55; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[160] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 55–56; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[161] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 56; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[162] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 56; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[163] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 18.

[164] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 56; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).  Ms. Boshears also told Ms. Hammett that, because of the age of the debt, PRA, LLC would not sue Ms. Hammett on the debt or report the debt to credit reporting agencies.  Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 56; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[165] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 56; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[166] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 56; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[167] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 56; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[168] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 57; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[169] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 57; Ex. 15 (Feb. 18, 2021

Next, Ms. Hammett gave Ms. Boshears her full name, Laura Lynn Hammett, and an address located in Conway, Arkansas.[170]  (This was the first time Ms. Hammett indicated to PRA, LLC that she lived in Arkansas.[171])  After that, Ms. Boshears told Ms. Hammett that, if Ms. Hammett didn't want PRA, LLC communicating with her, Ms. Hammett needed to send that request to PRA, LLC in writing.[172]  Ms. Boshears then asked Ms. Hammett to confirm that she was denying owing any debt to PRA, LLC.[173]  Ms. Hammett said that the Capital One debt was "absolutely" not hers.[174]  In response, Ms. Boshears said, "So I'll go ahead and set in a dispute for fraud for you . . . ."[175]  Ms. Boshears told Ms. Hammett that the account would be transferred to the "disputes department" and that Ms. Hammett should expect to receive "documentation in the mail in reference to the dispute."[176]

On February 20, 2021, Ms. Hammett sent PRA, LLC a written cease-and-desist letter.[177]  About two weeks later, Ms. Hammett received a letter from PRA, LLC dated February 19, 2021.[178]

---

Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[170] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 57; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[171] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 42.

[172] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 58; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).  PRA, LLC also gave Ms. Hammett the PRA, LLC address for Ms. Hammett's cease-and-desist letter.  Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 58; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[173] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 59; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[174] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 59; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[175] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 59; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[176] Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 59–60; Ex. 15 (Feb. 18, 2021 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[177] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 27; Hammett Dep. Vol. I (Doc. 164) at 67:16–19.

[178] Ex. A to Pl.'s Mot. for Partial Summ. J. (Doc. 39-1) at 2; Hammett Dep. Vol. I (Doc. 164) at 130:5–8 (Ms. Hammett stating that she received the letter dated February 19, 2021, in March 2021).

The letter listed an account number ending in -6049.[179]   The letter stated that the account balance

was $2,297.63.[180]   The letter said in part:

> The Disputes Department at Portfolio Recovery Associates, LLC ("PRA, LLC") understands that you wish to dispute this account because you have been a victim of identity theft or fraud.   The following information is being provided in response to your recent communication concerning the account referenced above.   Account number . . . 6049 and its proceeds were sold, assigned and transferred by the Seller to PRA, LLC on 11/19/2013.   At the time of the sale, the Seller provided an electronic file of its business records containing information concerning the account; a summary of which can be found below.   Please contact us if you would like to receive a payment history of payments that have posted to this account since our company purchased this account.[181]

In bold, at the bottom of the first page, PRA, LLC wrote that "[t]**his communication is from a**

**debt collector.   This communication is made for the limited purpose of responding to your**

**dispute and is NOT an attempt to collect a debt.**"[182]   The letter provided instructions on how a

customer can "dispute an account due to issues related to fraud/identity theft."[183]   According to the

letter, one of the ways a customer can dispute a debt is to submit an official "Identity Theft

Report."[184]   A customer can submit such a report by filling out a "PRA, LLC Identity Theft

Affidavit," which was attached to the letter.[185]

The attached affidavit is two pages long and has five sections.[186]   The first section seeks

personal information like a customer's full name and social security number.[187]   The second

---

[179] Ex. A to Pl.'s Mot. for Partial Summ. J. (Doc. 39-1) at 2.

[180] *Id.*

[181] *Id.*

[182] *Id.*

[183] *Id.* at 4.

[184] *Id.*

[185] *Id.* at 4–7.

[186] *Id.* at 6–7.

[187] *Id.* at 6.

section asks the customer to "check all that apply" to various options related to identity theft.[188]

The third section deals with a customer's willingness to cooperate with law enforcement in relation

to any fraud investigations.[189]   The fourth section asks for supporting documentation such as a

"Social Security Card" or a "Copy of Police Report or Report Made to Other Law Enforcement

Agency."[190]   The fifth and final section provides a signature line.[191]   The affidavit asks customers

to "[p]lease sign and date IN THE PRESENCE OF a Notary OR a Witness."[192]   The following

language appears in bold above the signature blanks:

> **I certify that to the best of my knowledge and belief, all the information on and attached to this affidavit is true, correct, complete, and made in good faith.  I also understand that this affidavit or the information contained may be made available to all law enforcement agencies for such action within their jurisdiction as they deem appropriate.  I understand that knowingly making any false or fraudulent statements or representations may constitute a violation of federal, state, or local criminal statutes, and may result in the imposition of fine, imprisonment, or both forms of punishment.**[193]

Ms. Hammett never filled out this affidavit.[194]

On March 10, 2021, Ms. Hammett filed the instant lawsuit.[195]   On March 11, 2021, PRA,

LLC closed Ms. Hammett's account and waived it "in light of the ongoing litigation" brought by

Ms. Hammett.[196]   On April 1, 2021, Ms. Hammett received a letter from PRA, LLC dated March

---

[188] *Id.*  For example, the affidavit lists the following option: "I did not authorize anyone to use my name or personal information to seek money, credit, loans, goods or services described in this report."  *Id.*

[189] *Id.* at 7.

[190] *Id.*

[191] *Id.*

[192] *Id.*

[193] *Id.*

[194] Hammett Dep. Vol. II (Doc. 164) 86:25–87:2.

[195] Compl. (Doc. 1).  On April 2, 2021, PRA, LLC emailed Ms. Hammett a courtesy copy of its answer to the Complaint.  Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 53.  PRA, LLC sent this email to an email address Ms. Hammett provided on the first page of a complaint she filed in a 2019 lawsuit in the Southern District of California.  *Id.* ¶¶ 52–53.  Ms. Hammett did not provide PRA, LLC with that email address and requested that PRA, LLC communicate with Ms. Hammett through a different email address.  *Id.* ¶ 53.

[196] Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 17.  Ms. Hammett denies

18, 2021.[197]  The letter was addressed to a Laura Lyman (not Laura Lynn).[198]  The letter referenced Lyman's account number and said that PRA, LLC had "completed the investigation into your dispute and your account has been closed."[199]  After Ms. Hammett contacted PRA, LLC about this erroneous letter, PRA, LLC sent Ms. Hammett a letter dated April 14, 2021.[200]  This letter was addressed to Ms. Hammett and referenced Ms. Hammett's (Laura Lynn's) account number.[201]  The balance was listed as zero.[202]  The letter said that "Portfolio Recovery Associates, LLC has closed this account."[203]  After receiving this letter, Ms. Hammett again contacted PRA, LLC to say that PRA, LLC left out language in the letter indicating that PRA, LLC had "concluded its investigation of [Ms. Hammett's] dispute."[204]  In response, PRA, LLC sent Ms. Hammett another letter dated April 23, 2021.[205]  This letter also listed Ms. Hammett's account balance as zero.[206]  The letter stated that "Portfolio Recovery Associates . . . has concluded its investigation of your dispute and is closing your account."[207]

---

this but fails to offer any evidence to raise a genuine dispute of material fact on whether PRA, LLC waived the debt. *See supra* note 40.

[197] Ex. 6 to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107-6) at 83; Ex. 15 (Apr. 10, 2021 (file ending 9340) Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[198] Ex. 6 to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107-6) at 82.

[199] Hammett Dep. Vol. I (Doc. 164) at 69:8–25.

[200] *Id.* at 70:1–6; *see also* Ex. 21 to Hammett Dep. (Doc. 164) (Under Seal at 166).

[201] Ex. 21 to Hammett Dep. (Doc. 164) (Under Seal at Doc. 166).

[202] *Id.*

[203] *Id.*

[204] Hammett Dep. Vol. I (Doc. 164) at 70:14–17.

[205] Ex. B to Pl.'s Mot. for Partial Summ. J. (Doc. 39-2) at 2.

[206] *Id.*

[207] *Id.*

**DISCUSSION**

This Order addresses three pending Motions: (1) PRA, LLC's Motion for Summary Judgment,[208] (2) Ms. Hammett's Motion to Amend,[209] and (3) Ms. Hammett's Motion for Partial Summary Judgment.[210]

**I.  PRA, LLC's Motion for Summary Judgment**

Ms. Hammett sues PRA, LLC for alleged violations of the following provisions of the Fair Debt Collection Practices Act (FDCPA):

- 15 U.S.C. § 1692b

- 15 U.S.C. § 1692c(a)(1)

- 15 U.S.C. § 1692c(c)

- 15 U.S.C. § 1692d

- 15 U.S.C. § 1692d(5)

- 15 U.S.C. § 1692e(10)

- 15 U.S.C. § 1692e(11)

- 15 U.S.C. § 1692e(13)

- 15 U.S.C. § 1692e(14)

- 15 U.S.C. § 1692g(a)(3)

- 15 U.S.C. § 1692g(a)(4)

- 15 U.S.C. § 1692g(a)(5).[211]

---

[208] Def.'s Mot. for Summ. J. (Doc. 75).

[209] Pl.'s Mot. to Amend (Doc. 33).

[210] Pl.'s Mot. for Partial Summ. J. (Doc. 37).

[211] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 253, 255, 257, 261, 263, 265, 268, 270, 271, 273, 275, 278.

Ms. Hammett also sues PRA, LLC for alleged violations of 47 U.S.C. § 227, which is part of the Telephone Consumer Protection Act (TCPA).[212]  Finally, under Arkansas state law, Ms. Hammett alleges that PRA, LLC committed the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and invasion of privacy by intrusion upon seclusion.[213]

PRA, LLC seeks summary judgment on all claims against it.[214]  Ms. Hammett's response (or lack thereof) to PRA, LLC's Motion has cleared some of the underbrush on Ms. Hammett's claims.  First, Ms. Hammett has expressly given up on her FDCPA claim under 15 U.S.C. § 1692c(c).[215]  Second, in her Brief in Opposition, Ms. Hammett did not respond to PRA, LLC's summary-judgment arguments respecting Ms. Hammett's FDCPA claims under 15 U.S.C. §§ 1692e(11), 1692e(14), and 1692g(3)–(5).[216]  So those claims are out.[217]  Third, Ms. Hammett has given up on her TCPA claims.[218]  And fourth, Ms. Hammett has given up on her state law claim for negligent infliction of emotional distress.[219]  That still leaves a lot of ground to cover.  Specifically, Ms. Hammett is still actively pressing (and defending against summary judgment) six FDCPA violations as well as two state common law torts.

---

[212] *Id.* ¶¶ 280–82.

[213] *Id.* ¶¶ 283, 296, 302.

[214] Def.'s Mot. for Summ. J. (Doc. 75).

[215] *See* Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 12 (conceding that PRA, LLC "did not violate 1692c(c)").

[216] *See id.* at 29 (Ms. Hammett stating that, "[b]ecause of time constraints, Plaintiff is skipping the other FDCPA arguments").  The Court granted two extensions of Ms. Hammett's deadline to file a response to PRA, LLC's Motion.  Feb. 10, 2022 Order (Doc. 84); Feb. 18, 2022 Order (Doc. 93).

[217] *See Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020) ("The 'failure to oppose a basis for summary judgment constitutes waiver of that argument,' because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment.") (quoting *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009)).  The Eighth Circuit makes clear that it is not a "District Court's responsibility to sift through the record to see if, perhaps, there [is] an issue of fact." *Id.* (quoting *Satcher*, 558 F.3d at 735).

[218] Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 29 (Ms. Hammett stating she "[w]ithdraws her TCPA claims").

[219] Hammett Dep. Vol. I (Doc. 164) at 15:24–16:3 (Ms. Hammett stating that she does not oppose PRA, LLC's Motion for Summary Judgment on the negligent-infliction-of-emotional-distress claim).

### A.  Summary Judgment Standard

A court shall grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[220]  The moving party has the burden to show that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[221]  Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[222]

Importantly, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment . . . ."[223]  The dispute of fact must be both genuine and material to prevent summary judgment.[224]  A genuine dispute of fact exists where a rational juror could decide the particular question of fact for the nonmoving party.[225]  A material dispute of fact exists where the juror's decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[226]

### B.  Ms. Hammett's FDCPA Claims

The Eighth Circuit explains that the "FDCPA is designed to protect consumers from abusive debt collection practices and to protect ethical debt collectors from competitive

---

[220] *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citing Fed. R. Civ. P. 56(c)(2)).

[221] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[222] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[223] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[224] *Id.*

[225] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[226] *Id.*

disadvantage."[227]  The FDCPA regulates debt collectors.  The FDCPA defines "debt collector" to mean "any person who uses any instrumentality of interstate commerce . . . in any business the principal purpose of which is the collection of any debts . . . ."[228]  With respect to debt collectors, the FDCPA "prohibits certain types of collection practices, such as the use or threat of violence, obscene language, publication of shame lists, and harassing or anonymous phone calls."[229]  Ms. Hammett brings numerous FDCPA claims against PRA, LLC.  The Court addresses them in turn, but the long and short of it is that Ms. Hammett's current claims do not get past summary judgment.

### 1.  15 U.S.C. § 1692b

Ms. Hammett alleges that PRA, LLC improperly communicated with her former fiancé, Michael Williams, in violation of 15 U.S.C. § 1692b.[230]  Section 1692b provides in relevant part:

> Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall—
>
> (1) identify himself, state that he is confirming or correcting location information concerning the consumer, and, only if expressly requested, identify his employer;
>
> (2) not state that such consumer owes any debt;
>
> (3) not communicate with any such person more than once unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information . . . ."

Ms. Hammett's § 1692b claim fails because it is time-barred.  The FDCPA has a one-year statute of limitations.[231]  The Eighth Circuit says that this limitations period is jurisdictional and

---

[227] *Peters v. Gen. Serv. Bureau, Inc.*, 277 F.3d 1051, 1054 (8th Cir. 2002).

[228] 15 U.S.C. § 1692a(6).  Nobody disputes that PRA, LLC is a debt collector.

[229] *Peters*, 277 F.3d at 1054.

[230] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 253–54.

[231] *Id.* at § 1692k(d) ("An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.").

"not subject to equitable tolling."[232]   Ms. Hammett alleges (without cognizable evidence) that PRA, LLC communicated with Mr. Williams in 2014.[233]   Ms. Hammett filed her Complaint on March 10, 2021—at least six years after PRA, LLC allegedly communicated with Mr. Williams.[234] That's about five years too late.   Thus, the Court lacks jurisdiction to entertain this claim.   The Court will dismiss this claim.[235]

## 2.  15 U.S.C. § 1692c(a)(1)

Ms. Hammett alleges that PRA, LLC called her after 9:00 p.m. in violation of 15 U.S.C. § 1692c(a)(1).[236]   Section 1692(c)(a)(1) provides:

(a) Communication with the consumer generally

Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—

(1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock [a.m.] and before 9 o'clock [p.m.], local time at the consumer's location . . . .

It is undisputed that PRA, LLC called Ms. Hammett, while she was living in Arkansas, two times after 9 p.m. Central Standard Time.   But this claim still has a fatal flaw.   On the facts in this record, the bona fide error defense shields PRA, LLC from liability.   No rational juror could conclude otherwise.

---

[232] *Hageman v. Barton*, 817 F.3d 611, 616 (8th Cir. 2016).

[233] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 163–67.

[234] Compl. (Doc. 1).

[235] Even if the claim were not time-barred, it would still fail at this stage.  There is no evidence in the record that would allow a rational juror to find that PRA, LLC ever communicated with Mr. Williams.  *See supra* note 48.  Without such evidence, no rational juror could conclude that PRA, LLC violated § 1692b.

[236] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 255–56.

The Eighth Circuit says that "[t]he bona fide error defense exists as an exception to the strict liability imposed upon debt collectors by the FDCPA."[237]  Under 15 U.S.C. § 1692k(c), "[a] debt collector may not be held liable in [an FDCPA action] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." According to the Eighth Circuit, a bona fide error is a "plausible and reasonable" error "made despite the use of procedures reasonably adapted to prevent that specific error."[238]

Given the factual record in this case, a rational juror could only conclude that PRA, LLC's two phone calls made to Ms. Hammett after 9:00 p.m. Central Standard Time were unintentional FDCPA violations.  These two calls (out of about 426 calls total) are the only calls that PRA, LLC made to a phone number associated with Ms. Hammett's account outside of § 1692c(a)(1)'s time restrictions.[239]  In both instances, PRA, LLC called Ms. Hammett's -6000 number, which had an area code associated with California.  If the calls would have landed in California, they would have been received almost two hours before 9:00 p.m. Pacific Standard Time and thus would not have violated § 1692c(a)(1)'s time restrictions.  Recall that PRA, LLC's initial information indicated that Ms. Hammett lived in California.  And on previous phone calls, no one (including Ms. Hammett) ever told PRA, LLC that Ms. Hammett lived in Arkansas.

For very similar reasons, a rational juror could only conclude that PRA, LLC's late phone calls were "plausible and reasonable" errors.[240]  Again, the -6000 number PRA, LLC called had a

---

[237] *Picht v. Jon R. Hawks, Ltd.*, 236 F.3d 446, 451 (8th Cir. 2001).

[238] *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 420 (8th Cir. 2008).  Resolving the question of whether procedures are "reasonably adapted to avoid" the error is a "fact-intensive inquiry."  *Id.* at 421.  Of course, where the record facts are not subject to genuine dispute and a rational juror could only reach one conclusion from those facts, summary judgment is warranted.

[239] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1–7.

[240] *Wilhelm*, 519 F.3d at 420.

California area code.  The phone calls would have been timely had the recipient been in California. PRA, LLC did not have a solid address for Ms. Hammett that established that she lived somewhere besides California.  The error as to her location (and thus the appropriate time to call her) is easy to understand.  It is certainly "plausible and reasonable."

Finally, a rational juror could only conclude that PRA, LLC "employed procedures 'reasonably adapted to avoid' the error[s] that occurred."[241]   The Court has summarized these procedures *supra* footnote 30.  ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████[242]  █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████   These procedures appear to directly and reasonably mitigate the risk that a collection call will be made outside the statutorily prescribed window.  Indeed, they even identify and try to mitigate the specific problem that occurred here—where a cellphone area code indicates a different time zone from a person's actual location.

The most generous reading of Ms. Hammett's position is that (1) the violations were intentional, (2) if unintentional, the violations were not "plausible and reasonable" errors, and (3)

---

[241] *Id.* at 421.

[242] Ex. 1 (Dreano Decl.) to Def.'s Statement of Facts (Doc. 78-3) (Under Seal at Doc. 121) ¶ 33; Ex. H to Ex. 1 to Def.'s Statement of Facts (Doc. 78-11) (Under Seal at Doc. 121) at 22–23.

in any event, PRA, LLC's procedures were not reasonably adapted to avoid the violations. All three of her arguments rely on the same basic facts.

First, Ms. Hammett notes that, in 2017, PRA, LLC somehow acquired (and called) Ms. Hammett's landline phone number at the Witts Springs cabin.[243] From this, Ms. Hammett argues that PRA, LLC knew she was living in Arkansas when it made the two after-hours calls. Recall that, in August 2017, PRA, LLC spoke with someone on the Witts Springs cabin landline who said that Ms. Hammett would not be back until September. But PRA, LLC never knowingly spoke with Ms. Hammett on this number. And the unidentified recipient of the August 2017 call never suggested that Ms. Hammett lived at the cabin permanently. The limited and vague 2017 contact with a person unknown to PRA, LLC regarding Ms. Hammett's "September return" occurred over three years before the two after-hours calls. PRA, LLC's knowledge of the Witts Springs landline (and maybe the related location of the cabin) does not mean that PRA, LLC knew that Ms. Hammett was in Arkansas in late January and early February of 2021.

Second, Ms. Hammett points to a soft-credit inquiry that PRA, LLC performed on her in November of 2019, and says that the inquiry would have revealed to PRA, LLC that she was living in Arkansas. The problem for Ms. Hammett is that the record only establishes that such an inquiry was made. It does not in any way suggest what the inquiry revealed. Without speculating, which is forbidden, a rational juror could not conclude that this inquiry informed PRA, LLC of Ms. Hammett's Arkansas residency.[244]

---

[243] Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 14.

[244]

In short, the facts relied on by Ms. Hammett do not in any way undermine the conclusion that the two after-hours calls were (1) unintentional and (2) "plausible and reasonable" errors. Nor do they undermine the conclusion that (3) PRA, LLC's procedures were "reasonably adapted" to guard against the two outlier violations of § 1692c(a)(1).

It is fair to say that PRA, LLC likely knew, in 2017, that the phone number to the Witts Springs cabin was a landline with an Arkansas area code. But PRA, LLC did not have solid information that Ms. Hammett lived there, let alone on a continuing basis. Hunches and leads are different from knowledge. The only solid information that PRA, LLC had as to Ms. Hammett's whereabouts indicated that she resided in California—which matched the area code of the cellphone to which the two offending calls were made.[245] To benefit from the bona-fide-error defense, PRA, LLC was not required to input into its calling system every possible *time zone* in which Ms. Hammett *might* have been living. That would be the gold-standard of collection practices. And perhaps PRA, LLC should consider adopting a best practice like this one in the future. But the bona fide error defense doesn't require perfection. Its touchstone is reasonableness—specifically the "maintenance of procedures reasonably adapted" to avoid violations.[246] Not a low hurdle, but not a terribly high one either. PRA, LLC did not have to take "every conceivable precaution" to avoid a violation of § 1692c(a)(1).[247] It had to take reasonable precautions. It did so. Every rational juror would conclude that PRA, LLC prevails under the bona fide error defense.

---

[245] PRA, LLC did not have to "conduct[] an independent investigation" of Ms. Hammett's current address. *Cf. Smith v. Transworld Sys.*, 953 F.2d 1025, 1032 (6th Cir. 1992) (agreeing with the trial court that the FDCPA did not require an "independent investigation of [a] debt referred for collection") (internal quotations omitted).

[246] 15 U.S.C. § 1692k(c).

[247] *Scott v. Portfolio Recovery Assocs.*, 139 F. Supp. 3d 956, 971 (S.D. Iowa 2015) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 539 (7th Cir. 2005)).

### 3.  15 U.S.C. §§ 1692d & 1692d(5)

Ms. Hammett alleges that PRA, LLC violated 15 U.S.C. § 1692d generally and § 1692d(5) specifically.  With respect to § 1692d, Ms. Hammett alleges that PRA, LLC violated this provision by "contacting [Ms.] Hammett incessantly, coercing her into speaking on a recorded line, and mailing an 'affidavit' for [Ms.] Hammett to fill out that brought up horrible events from the past . . . ."[248]  With respect to § 1692d(5), Ms. Hammett alleges that PRA, LLC violated this provision by "making an insufferable number of calls to [Ms.] Hammett . . . ."[249]

Section 1692d provides as follows:

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.

(2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

(3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 1681a(f) or 1681b(3) of this title.

(4) The advertisement for sale of any debt to coerce payment of the debt.

(5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

(6) Except as provided in section 1692b of this title, the placement of telephone calls without meaningful disclosure of the caller's identity.

---

[248] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 261–62.

[249] *Id.* ¶¶ 263–64.

No rational juror could conclude—at least on this record—that PRA, LLC violated the general prohibition of § 1692d or the specific prohibition of § 1692d(5).

As for the general prohibition of § 1692d, the Supreme Court counsels that "[s]tatutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter."[250] This Court "must read §1692d in its entirety to determine what constitutes harassment, oppression, or abuse."[251] In providing the (admittedly non-exhaustive) examples of prohibited conduct in §§ 1692d(1)–(6), the statute itself illustrates the proper way to define "harassment, oppression, or abuse." None of that conduct in the prohibited examples constitutes run-of-the-mill debt-collection activity. All of the prohibited conduct in the statutorily provided examples is egregious—far beyond mere inconveniences. The general prohibition in § 1692d must be read in this light such that the entire section proscribes egregious conduct and not mere inconveniences.[252]

Other district judges in the Eighth Circuit have come to the same basic conclusion. For example, in *Fox v. Procollect, Inc.*, Judge Holmes (then of the Eastern District of Arkansas) emphasized that § 1692d prohibits "fairly egregious conduct."[253] Judge Holmes noted that the

---

[250] *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (internal quotations and citation omitted).

[251] *Fox v. ProCollect, Inc.*, No. 4:17-cv-00634-JLH, 2019 WL 386159, at *5 (E.D. Ark. Jan. 30, 2019).

[252] The Court recognizes that the examples listed in §§ 1692d(1)–(6) are non-exhaustive. The Court also recognizes that Congress made clear that the listed examples are not meant to "limit[] the general application" of § 1692d. This statutory command defeats the negative-implication canon—*expressio unius*. Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 107, 132–133 (2012) ("The expression of one thing implies the exclusion of others . . . ."). It also greatly tempers another canon of statutory construction—*ejusdem generis. Id.* at 199 ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned."). To be clear, then, other actions not encapsulated by (or even not similar to) the six listed examples are actionable if the "natural consequence" of those actions is "to harass, oppress, or abuse." 15 U.S.C. § 1692d. Still, none of this means that the listed examples are entirely irrelevant to the Court's analysis of the general prohibition in § 1692d. The examples can and do inform the Court's understanding of what it means to "harass, oppress, or abuse" a debtor. *See Davis v. Phelan Hallinan & Diamond PC*, 687 F. App'x 140, 145 (3d Cir. 2017) ("Although that list does not strictly limit the general application of the prohibition, it illustrates the level of culpability required to violate § 1692d.").

[253] 2019 WL 386159, at *6.

"Sixth Circuit has described the conduct in § 1692d as 'tactics intended to embarrass, upset, or frighten a debtor.'"[254]  Similarly, in *VanHorn v. Genpact Services, LLC*, Judge Fenner of the Western District of Missouri explained that, "[w]hen reading § 1692d in its entirety, it is evident [that] absent egregious conduct or intent to annoy, abuse, or harass, a debt collector does not violate the FDCPA by persistently calling in the attempt to reach a debtor regarding a debt owed and due."[255]

No record evidence hints at threats of violence, the use of obscene language, or anything else that could come close to the type of conduct § 1692d proscribes.  Thus, no rational juror could conclude that PRA, LLC "engag[ed] in any conduct the natural consequence of which [was] to harass, oppress, or abuse" Ms. Hammett.[256]  For her § 1692d arguments, Ms. Hammett points to

---

[254] *Id.* (quoting *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 330 (6th Cir. 2006).

[255] No. 09-1047-cv, 2011 WL 4565477, at *3 (W.D. Mo. Feb. 14, 2011).

[256] 15 U.S.C. § 1692d.  In her Brief in Opposition to Summary Judgment, Ms. Hammett asserts in passing that she has stated a claim against PRA, LLC for a violation of 15 U.S.C. § 1692d(6).  Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 16–17.  The Brief quickly argues that PRA, LLC did not provide Ms. Hammett with a meaningful disclosure on the phone calls.  *Id.* at 17.  Ms. Hammett seems to argue that, on the phone calls, PRA, LLC omitted facts "that would lead one to conclude that [PRA, LLC] was . . . a debt collector or that the call [was] . . . a debt collection call."  *Id.* (internal quotations omitted) (citation omitted).  Such an omission, to Ms. Hammett, means that PRA, LLC violated § 1692d(6)'s mandate that a debt collector provide a "meaningful disclosure of its identity" on phone calls.  There are numerous problems with Ms. Hammett's argument.  Most importantly, Ms. Hammett's First Amended and Supplemented Complaint is very specific when it comes to her claims.  She detailed (in chapter and verse) twelve provisions of the FDCPA that PRA, LLC allegedly violated.  First Am. and Suppl. Compl. (Doc. 6) ¶¶ 252–79.  Section 1692d(6) was not one of those provisions.  Ms. Hammett cannot use a summary judgment brief to allege claims that were not included in her operative pleading.

In any event, Ms. Hammett's substantive § 1692d(6) argument does not hold water.  No rational juror could conclude that Ms. Hammett ever allowed PRA, LLC an opportunity to make the in-depth disclosures that Ms. Hammett believes PRA, LLC was required to provide.  Most of the connected calls that PRA, LLC placed to Ms. Hammett were terminated by Ms. Hammett after PRA, LLC said it was calling on a recorded line.  *See supra* pp. 12–16.  On the calls that got past the hang-up stage, Ms. Hammett went out of her way to avoid confirming her identity with personally identifying information.  Because Ms. Hammett would not confirm her identity, PRA, LLC representatives did not expound on why they were calling.  Ms. Hammett fails to direct the Court to any binding authority that says a debt collector must reveal its identity and the purpose of a call before the debt collector even knows it is speaking with the correct person.  In fact, if a debt collector did so, it would likely subject itself to liability for unlawful third-party disclosures.  *See* 15 U.S.C. 1692c(b) (prohibiting debt collectors from communicating, "in connection with the collection of any debt, with any person other than the consumer . . .").

It is also worth noting that, out of the hundreds of calls in this case, there's only one substantive call where a PRA, LLC representative did not provide the name of the company very early on in the call.  On that call, after the PRA, LLC representative gave his name, Ms. Hammett asked the representative to hold and then (1) demanded that the

(1) what she characterizes as incessant phone calls, (2) PRA, LLC's use of a recorded line, and (3) PRA, LLC's dispatch of the debt-dispute letter.   The Court will now address each of her contentions.

### a. Persistent Phone Calls

Ms. Hammett argues that PRA, LLC violated § 1692d(5) "by making an insufferable number of calls to [Ms.] Hammett that [Ms.] Hammett refused to speak with them on."[257]   Because § 1692d(5) speaks specifically about phone calls, it provides the analytical framework for this allegation.   Under § 1692d(5), the issue boils down to whether a rational juror could conclude that PRA, LLC intended to annoy, abuse, or harass when it placed about 187 phone calls over the course of a year and after being told not to call the -6000 number.[258]

The answer to that question is no.   "[W]hether a debt collector's conduct in attempting to contact a debtor by telephone amounts to harassment or annoyance in violation of [§ 1692d(5)] ultimately turns on evidence regarding the volume, frequency, pattern, or substance of the phone calls."[259]   "[T]his is a fact-intensive issue," but "it may be resolved as a matter of law when the summary judgment record establishes that no [rational juror] could find the requisite level of harassment."[260]   And while the Eighth Circuit has not set out a definitive gauge for evaluating

---

representative delete the call and (2) threatened criminal prosecution before hanging up on the representative.   Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 28; Ex. 15 (Dec. 16, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[257] First Am. and Suppl. Compl. (Doc. 6) ¶ 264.

[258] As mentioned *supra* Section I.B.1, the statute of limitations under the FDCPA is one year.   Ms. Hammett filed her original Complaint on March 10, 2021.   Compl. (Doc. 1).   For purposes of Ms. Hammett's FDCPA claims, the look-back period goes to March 10, 2020—one year back from the date on which Ms. Hammett filed her Complaint.

[259] *Kuntz v. Rodenburg LLP*, 838 F.3d 923, 926 (8th Cir. 2016) (quoting *Kavalin v. Global Credit & Collection Corp.*, No. 10-cv-314, 2011 WL 1260210, at *4 (W.D.N.Y. Mar. 31, 2011)).

[260] *Id.* (collecting cases).

when a number of phone calls reaches that requisite level, "[c]ourts generally agree . . . that a high volume of calls will rarely, if ever make out a FDCPA violation on its own."[261]

Let's start with call volume and frequency. PRA, LLC called phone numbers associated with Ms. Hammett's account approximately 187 times between March 10, 2020, and February 17, 2021. That's about seventeen calls a month (most of which went unanswered). PRA, LLC never called a number associated with Ms. Hammett's account more than once a day. No rational juror could find that the call volume and frequency indicated that PRA, LLC "repeatedly or continuously" called or spoke with Ms. Hammett "with intent to annoy, abuse, or harass" her.[262] Other district court judges have reached similar conclusions. For example, in *Van Horn*, Judge Skenner found that 114 calls in a four-month period did not violate the FDCPA.[263] In *Carman v. CBE Group, Inc.*, Judge Robinson from the District of Kansas granted summary judgment to a debt collector on a § 1692d(5) claim when that debt collector called the plaintiff 149 times in a two-month period.[264]

The pattern and substance of the calls also offer no help to Ms. Hammett's § 1692d(5) claim. Aside from the two calls discussed *supra* Section I.B.2, PRA, LLC never called a number associated with Ms. Hammett's account before 8:00 a.m. and after 9:00 p.m. That means that 99% of the phone calls were made within the timeframe assumed convenient in the FDCPA. (And the Court has already concluded that the other two phone calls were the product of a good-faith mistake

---

[261] *Fox*, 2019 WL 386159, at *2.

[262] 15 U.S.C. § 1692d(5).

[263] 2011 WL 4565477, at *1.

[264] 782 F.Supp.2d 1223, 1229–1232 (D. Kan. 2011); *see also Clingaman v. Certegy Payment Recovery Servs.*, No. H–10–2483, 2011 WL 2078629, at *4–5 (S.D. Tex. May 26, 2011) (granting summary judgment for a defendant who placed 55 phone calls over three and a half months).

as to Ms. Hammett's whereabouts.)  So no rational juror could conclude that PRA, LLC's pattern of calls evidenced an intent to annoy, abuse, or harass Ms. Hammett.

Likewise, no rational juror could conclude that the substance of the phone calls between Ms. Hammett and PRA, LLC manifested such an intent.   PRA, LLC never threatened Ms. Hammett, used obscene language with Ms. Hammett, misrepresented who it was, or otherwise engaged in any conversations that could lead a rational juror to conclude that PRA, LLC, through its phone calls, intended to annoy, abuse, or harass Ms. Hammett.

Ms. Hammett resists this conclusion with two main arguments.  They are not persuasive. First, Ms. Hammett argues that PRA, LLC's phone logs are inaccurate and thus a genuine fact dispute precludes summary judgment on her § 1692d claims.[265]  As discussed above, Ms. Hammett speculates that PRA, LLC called her more times than PRA, LLC's phone logs show.[266]  She does not provide any evidence to support this speculation.  In any event, even if the Court adds the fifteen calls that Ms. Hammett speculates PRA, LLC made, doing so would not create a genuine

---

[265] Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 16.  Ms. Hammett invokes Federal Rule of Civil Procedure 56(d) to argue that the Court should either deny outright or delay ruling on PRA, LLC's Motion because she has not had adequate time for discovery to ascertain how many times PRA, LLC called her before November 18, 2020.  *Id.* at 6.  Rule 56(d) allows a court to "defer considering a summary judgment motion or allow time for discovery '[i]f a nonmovant shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition.'"  *Anzaldua v. Ne. Ambulance and Fire Prot. Dist.*, 793 F.3d 822, 836 (8th Cir. 2015) (quoting Fed. R. Civ. P. 56(d)).  PRA, LLC filed its Motion on January 28, 2022 (almost a year after this case was filed).  Def.'s Mot. for Summ. J. (Doc. 75).  Ms. Hammett moved for and received two extensions to respond to PRA, LLC's Motion.  Feb. 10, 2022 Order (Doc. 84); Feb. 18, 2022 Order (Doc. 93). This gave Ms. Hammett up to March 1, 2022 (an additional month and a half after the original response deadline), to continue discovery (and to timely move to compel discovery) and respond to PRA, LLC's Motion.  On March 1, 2022 (a day before the discovery deadline), Ms. Hammett filed her Opposition to PRA, LLC's Motion and included in it her Rule 56(d) request.  In the request, Ms. Hammett says that she has been unable to get records identifying PRA, LLC's third-party phone-service providers.  Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 7.  She says that records from these providers would reveal the number of phone calls PRA, LLC made to her.  *See id.*  Ms. Hammett only sets "forth some facts she 'hope[s] to elicit from further discovery.'"  *Anzaldua*, 793 F.3d at 836–37 (quoting *Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998)). That is not enough to justify the relief Ms. Hammett seeks.  *Id.* at 836.  The Court denies Ms. Hammett's request. This is simply not an instance where PRA, LLC blindsided Ms. Hammett with a premature summary judgment motion, the chief harm Rule 56(d) guards against.

[266] *See supra* note 83.

dispute of material fact. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[267]  Fifteen additional calls would barely raise the average number of calls.  Further, the calls that Ms. Hammett alleges to have occurred (and speculates came from PRA, LLC) were made on different days and at reasonable times.[268]

Second, Ms. Hammett argues that PRA, LLC should have stopped calling her after she told PRA, LLC to stop calling.[269]  For starters, Ms. Hammett never verified her identity on calls initiated by PRA, LLC.  (PRA, LLC didn't know who was telling it to stop calling.)  The FDCPA does not force debt collectors to honor requests to stop calling a phone number every time an unidentified person tells them to stop doing so.  Not heeding such a request does not give rise to an FDCPA violation and does not (on its own) show an "intent to annoy, abuse, or harass" a debtor.[270]

Even had Ms. Hammett properly identified herself, PRA, LLC would still be entitled to summary judgment.  Ms. Hammett would argue that a rational juror could infer an intent to annoy, abuse, or harass based on the number of calls made after Ms. Hammett asked PRA, LLC to stop calling.  But such an argument would fail.  Where courts have "held intent to harass could be inferred, the debt collector did more than simply continue to call or speak to the plaintiff after being asked to stop."[271]  In our case, unlike other cases, the debt collector did "nothing more."

---

[267] *Anderson*, 477 U.S. at 252.

[268] *See* Aff. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) ¶ 26.  Ms. Hammett has no personal recollection of any of these alleged calls, and thus a rational juror could not use the unknown substance of these calls to determine that PRA, LLC somehow crossed the line.  Even if the Court credited Ms. Hammett's speculation (which it does not), a rational juror still could not find for Ms. Hammett on her § 1692d claims.

[269] Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 21.

[270] 15 U.S.C. § 1692d(5).

[271] *Fox*, 2019 WL 386159, at *5.

Finally, it is worth mentioning that Congress has provided a mechanism by which a debtor can stop a collector's communications—a written cease-and-desist letter.[272]  On the November 18, 2020 call, PRA, LLC told Ms. Hammett that she could put her request—that communication stop––in writing.  She did not do so at that time; indeed, she did not do so until February 20, 2021, which was after all of the calls at issue here.  If Congress only prohibits calls to a debtor after that debtor has submitted a written cease-and-desist letter to a debt collector, it stands to reason that a verbal request by the debtor is not enough to trigger an FDCPA violation.

### b.  The Recorded Line

Ms. Hammett argues that PRA, LLC calling her on a recorded line constituted harassment because she "begged not to be recorded . . . ."[273]  But companies calling people on recorded lines is a ubiquitous practice.  It is a fact of life.  No rational juror could conclude that the mere use of a recorded line on its own constitutes harassment, oppression, or abuse.  Nor could a rational juror conclude that the use of a recorded line somehow transforms otherwise legal calls (such as the 187 calls discussed above) into prohibited harassment, oppression, or abuse.  Ms. Hammett does not provide the Court with a single case suggesting that the use of a recorded line constituted harassment, oppression, or abuse.  And the Court has found none.

### c.  The Debt-Dispute Letter

Ms. Hammett argues that the debt-dispute letter violated § 1692d—because the "identity theft affidavit . . . looked like a threat to prosecute [Ms.] Hammett if she did not answer the invasive questions."[274]  For this type of communication, the Eighth Circuit gauges an FDCPA violation by "utilizing the unsophisticated-consumer standard which is designed to protect consumers of below

---

[272] 15 U.S.C. § 1692c(c).

[273] Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 18.

[274] *Id.* at 25.

average sophistication or intelligence without having the standard tied to the very last rung on the sophistication ladder."[275]  While "[t]his standard protects the uninformed or naive consumer," it still "contains an objective element of reasonableness to protect debt collectors from liability for peculiar interpretations of collection letters."[276]  Finally, "[t]he unsophisticated consumer test is a practical one, and statements that are merely susceptible of an ingenious misreading do not violate the FDCPA."[277]

No rational juror (looking through the lens of an unsophisticated consumer) could consider the sending of this letter or the letter itself to be "harass[ment], oppress[ion], or abuse" on PRA, LLC's part.[278]  The letter came on the heels of Ms. Hammett's denial of the debt.  The letter explained how Ms. Hammett could dispute the debt that PRA, LLC said she owed.  The letter contained no threats, did not demand payment, and specifically (in bold-faced type) said that the letter was sent "**for the limited purpose of responding to [Ms. Hammett's] dispute and is NOT an attempt to collect a debt.**"[279]

### 4. 15 U.S.C. § 1692e(10) & (13)

Ms. Hammett alleges that PRA, LLC violated 15 U.S.C. § 1692e(10) and (13) by sending her the debt-dispute letter.[280]  She also alleges that PRA, LLC violated § 1692e(10) by sending her a letter addressed to Laura Lyman (not Laura Lynn).[281]  She alleges that both letters were backdated.[282]

---

[275] *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir.2004) (internal quotations omitted).

[276] *Id.* at 317–18.

[277] *Peters*, 277 F.3d at 1056 (internal quotations omitted).

[278] 15 U.S.C. § 1692d.

[279] Ex. A to Pl.'s Mot. for Partial Summ. J. (Doc. 39-1) at 2.

[280] First Am. and Suppl. Compl. (Doc. 6) ¶¶ 265–67.

[281] *Id.* ¶¶ 203–17.

[282] *Id.* ¶¶ 213, 260.

Section 1692e provides in relevant part:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:

. . .

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

. . .

(13) The false representation or implication that documents are legal process.

The letters sent to Ms. Hammett are not actionable under § 1692e because they were not sent "in connection with the collection of any debt."[283]  To establish a violation under § 1692e, a plaintiff must show that a communication was "in connection with the collection of any debt."[284] The Eighth Circuit uses the "animating purpose test" to determine whether "certain statements or conduct are in connection with the collection of a debt."[285]  "Under this test, 'for a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor.'"[286]  "An explicit demand for payment is not required for a communication to satisfy the animating purpose test; implicit demands for payment may satisfy the test based upon the specific content of the communications."[287]  Whether the animating purpose of a communication is to induce payment is "a question of fact that generally is committed to the

---

[283] 15 U.S.C. § 1692e.

[284] *McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 913 (8th Cir. 2014).

[285] *Heinz v. Carrington Mortg. Serv., LLC*, 3 F.4th 1107, 1112 (8th Cir. 2021).

[286] *Id.* (quoting *McIvor*, 773 F.3d at 914).

[287] *Id.*

discretion of the jurors, not the court," but "where a reasonable jury could not find that an animating purpose of the statements was to induce payment, summary judgment is appropriate."[288]

Let's begin with the debt-dispute letter.  No rational juror could conclude that an animating purpose of the letter was to induce payment.  PRA, LLC sent this letter in response to Ms. Hammett's dispute of the debt.  The letter did not expressly demand payment.  In fact, the letter specifically stated (in bold-faced type) that this "**communication is made for the limited purpose of responding to your dispute and is NOT an attempt to collect a debt.**"[289]  The letter contained no implicit demand either.  The letter stated a balance due but "did not demand payment or threaten consequences" if Ms. Hammett did not pay.[290]  If anything, the letter provided Ms. Hammett with an avenue to avoid the debt.  There is simply no record evidence upon which a rational juror could conclude that this letter was "in connection with the collection of any debt."[291]

The same is true for the Laura Lyman letter.  As a reminder, this is a letter Ms. Hammett received in March 2021 that (1) was addressed to Laura Lyman (instead of Laura Lynn), (2) said that PRA, LLC was closing Laura Lyman's account, and (3) listed the amount owed as $0.00.  A rational juror could not conclude that an animating purpose behind this letter was the collection of a debt.  Putting aside the incorrect name and account, the letter literally said PRA, LLC was closing

---

[288] *Id.* (cleaned up).

[289] Ex. A to Pl.'s Mot. for Partial Summ. J. (Doc. 39-1) at 2.

[290] *Heinz*, 3 F.4th at 1113–14 (citing *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011)).

[291] 15 U.S.C. § 1692e.  Even if a rational juror could conclude that this letter was "sent in connection with the collection of any debt," Ms. Hammett's claims with respect to this letter would still fail.  *Id.*  Falsity is a requirement for FDCPA liability under this section.  *McIvor*, 773 F.3d at 913.  There is no record evidence that this letter was false in any way.  Moreover, no rational juror could agree with Ms. Hammett's claim that the affidavit in the debt-dispute letter was a "false representation or implication that [the debt-dispute letter was] legal process."  15 U.S.C. § 1692e(13).  Nothing about the debt-dispute letter (or the affidavit) would suggest to the "unsophisticated consumer" that the letter was legal process.  Process is "[a] summons or writ, esp. to appear or respond in court . . . ."  *Process*, Black's Law Dictionary (11th ed. 2019).  Neither the letter nor the included affidavit makes any mention of a court or otherwise suggests that any type of legal proceeding was on the horizon.

an account and no debt was owed.  No rational juror could conclude that this letter was sent in connection with the collection of a debt.

With respect to the debt-dispute letter, Ms. Hammett says that the letter "was not meant to help Plaintiff.  It was meant to collect personal information about Plaintiff, like an overbroad set of interrogatories."[292]  With respect to the Laura Lyman letter, Ms. Hammett says that "[i]t was a ruse to make plaintiff think she won her dispute . . . ."[293]  Both positions are nothing more than speculation by Ms. Hammett.  Such speculation fails to create a genuine issue of material fact. There is no evidence from which a rational juror could reach Ms. Hammett's position.

### C.  Ms. Hammett's Intentional Infliction of Emotional Distress Claim

Ms. Hammett alleges that PRA, LLC committed the tort of intentional infliction of emotional distress—otherwise known as the tort of outrage.[294]  Ms. Hammett's supporting allegations center around (1) PRA, LLC's alleged contact with Mr. Williams in 2014, (2) PRA, LLC's alleged dispatch of backdated letters (the debt-dispute letter and Laura Lyman letter), which "caused cognitive dissonance" in Ms. Hammett, and (3) the number of phone calls PRA, LLC made to Ms. Hammett.[295]  Ms. Hammett says that this conduct caused her emotional distress "so severe that no reasonable person could be expected to endure it."[296]

---

[292] Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 27.

[293] *Id.*

[294] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 283–95.  In Arkansas, the tort of intentional infliction of emotional distress is the tort of outrage.  *See Neff v. St. Paul Fire & Marine Ins. Co.*, 304 Ark. 18, 20, 799 S.W.2d 795, 796 (1990) (stating that the Arkansas Supreme Court "first recognized the tort of outrage—the intentional infliction of emotional distress—in *M.B.M. Co. v. Counce* . . .").

[295] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 213, 285, 288, 294–95.

[296] *Id.* ¶¶ 293–94.

The parties assume that Arkansas law applies.[297]  In Arkansas, the statute of limitations for the tort of outrage is three years.[298]  The Arkansas Supreme Court "has taken a very narrow view of claims of outrage."[299]  To prevail at trial on her outrage claim, Ms. Hammett would have to prove, by a preponderance of the evidence, "the following elements: (1) [PRA, LLC] intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of [its] conduct; (2) [PRA, LLC's] conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency,' and was 'utterly intolerable in a civilized community;' (3) the actions of [PRA, LLC] were the cause of [Ms. Hammett's] distress; and (4) the emotional distress sustained by [Ms. Hammett] was so severe that no reasonable person could be expected to endure it."[300]

The Arkansas Supreme Court says that "the tort of outrage requires clear-cut proof."[301] And while "[t]he type of conduct that meets the standard for outrage must be determined on a case-by-case basis,"[302] "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[303]  Accordingly, "[m]erely describing the conduct as outrageous does not make it so."[304]

---

[297] *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 76-1) (Under Seal at Doc. 121) at 37 (relying on Arkansas law); Br. in Supp. of Pl's Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 31 (agreeing with PRA, LLC's use of Arkansas law).

[298] *Hutcherson v. Rutledge*, 2017 Ark. 359, at 5, 533 S.W.3d 77, 80.

[299] *Renfro v. Adkins*, 323 Ark. 288, 299, 914 S.W.2d 306, 311 (1995).

[300] *McQuay v. Guntharp*, 331 Ark. 466, 470, 963 S.W.2d 583, 585 (1998) (quoting *Angle v. Alexander*, 328 Ark. 714, 722, 945 S.W.2d 933, 937 (1997)).

[301] *Renfro*, 323 Ark. at 299, 914 S.W.2d at 312.

[302] *Crockett v. Essex*, 341 Ark. 558, 564, 19 S.W.3d 585, 589 (2000) (quoting *Hollomon v. Keadle*, 326 Ark. 168, 931 S.W.2d 413 (1996)).

[303] *Palmer v. Ark. Council on Econ. Educ.*, 344 Ark. 461, 474, 40 S.W.3d 784, 791–92 (2001) (quoting *Givens v. Hixson*, 275 Ark. 370, 372, 631 S.W.2d 263, 264 (1982)).

[304] *Renfro*, 323 Ark. at 299, 914 S.W.2d at 312.

On this record, no rational juror could conclude that PRA, LLC's conduct went "beyond all possible bounds of decency . . . to be regarded as atrocious, and utterly intolerable in a civilized community."[305]  With respect to PRA, LLC allegedly contacting Mr. Williams and sending backdated letters, the Court has already explained that there is no record evidence to support such speculation.  No rational juror could find "atrocious" conduct where there is no evidence of the alleged conduct in the first place.  In any event, even if this alleged conduct actually occurred, it would not have been so "atrocious" as to allow a rational juror to conclude that PRA, LLC is liable for the tort of outrage.

The same conclusion holds for the number and type of phone calls that PRA, LLC made to Ms. Hammett.  No rational juror would consider the calls to be "atrocious" conduct.  In the three years before Ms. Hammett filed her original Complaint (on March 10, 2021), PRA, LLC called phone numbers associated with her account about 348 times—an average of about ten calls a month.[306]  (Of course, a vast majority of those calls went unanswered.)  Specific to Ms. Hammett's -6000 number, during the three-year look-back period, PRA, LLC called that number forty-five times over the course of three months.  A rational juror could find that the total number of calls to all numbers, or the calls to the -6000 number, were an inconvenience.  But that doesn't make them "atrocious."

The substance of the conversations that PRA, LLC had with Ms. Hammett could not be considered "atrocious" by a rational juror.  PRA, LLC did not threaten Ms. Hammett, lie to her about who was calling, use obscene language, call at all hours of the night, or call her multiple times a day.  For better or worse, anyone with a phone (including a rational juror and the Court)

---

[305] *Palmer*, 344 Ark. at 474, 40 S.W.3d at 791–92 (quoting *Givens*, 275 Ark. at 372, 631 S.W.2d at 264).

[306] Ex. D to Ex. 1 to Def.'s Statement of Facts (Doc. 78-7) (Under Seal at Doc. 121) at 1–5.

receives a lot of unsolicited phone calls. They are, for sure, an inconvenience. But such calls are not "utterly intolerable in a civilized community."[307]  At bottom, nothing PRA, LLC did or said with respect to Ms. Hammett was so extreme or outrageous as to allow a rational juror to find that PRA, LLC is liable for the tort of outrage. The Court therefore grants summary judgment to PRA, LLC on Ms. Hammett's outrage claim.

### D.  Ms. Hammett's Invasion of Privacy by Intrusion Upon Seclusion Claim

Ms. Hammett alleges that PRA, LLC invaded her privacy by (1) "refusing to stop calling her unless she spoke on a recorded line," (2) "calling [Ms.] Hammett repeatedly without meaningful identification," (3) forcing "[Ms.] Hammett to be taped in order to make the calls stop," (4) demanding that Ms. Hammett tell PRA, LLC her birthday, (5) demanding that Ms. Hammett "lend her voice to" PRA, LLC's recordings, and (6) emailing Ms. Hammett at an email address she did not own until after 2007.[308]

The parties assume that Arkansas law applies.[309]  Under Arkansas law, intrusion upon seclusion is one of four "invasion of privacy" torts.[310]  For this tort, the Arkansas Supreme Court has "adopted the approach of the Restatement (Second) of Torts . . . ."[311]  In the Restatement, liability for intrusion upon seclusion is defined as follows:

> One who intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns, is subject to liability to the

---

[307] *Palmer*, 344 Ark. at 474, 40 S.W.3d at 792 (quoting *Givens*, 275 Ark. at 372, 631 S.W.2d at 264).

[308] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 302–03, 306–07, 309, 312–13.

[309] *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 76-1) (Under Seal at Doc. 121) at 43 (citing Arkansas law); Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 45 (stating that "[t]he bar on a seclusion claim in Arkansas is a bit lower than on outrage").

[310] *Dodrill v. Ark. Democrat Co.*, 265 Ark. 628, 637, 590 S.W.2d 840, 844 (1979) (citing Restatement (Second) of Torts § 652A (1977)); *see also Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 875 (8th Cir. 2000) (applying Arkansas law).

[311] *McMullen v. McHughes Law Firm*, 2015 Ark. 15, at 13, 454 S.W.3d 200, 209.

other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.[312]

Applying Arkansas law, the Eighth Circuit explains that intrusion upon seclusion has three elements: "(1) an intrusion (2) that is highly offensive (3) into some matter in which a person has a legitimate expectation of privacy."[313]  According to the Arkansas Supreme Court, an intrusion is an "invasion . . . upon the plaintiff's solitude or seclusion" done by someone who "believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act."[314]  Ultimately, "[a] legitimate expectation of privacy is the 'touchstone' of the tort of intrusion" upon seclusion.[315]  That is, "a person's behavior may give rise to an inference that he [or she] no longer expects to maintain privacy in some aspect of his [or her] affairs."[316]

No record facts support Ms. Hammett's theory of liability.  With respect to the recording issue (calling on a recorded line and making Ms. Hammett "lend her voice" to PRA, LLC), no rational juror could conclude that PRA, LLC forced Ms. Hammett to speak on a recorded line. PRA, LLC, not unlike countless other businesses, simply called Ms. Hammett on a recorded line. PRA, LLC even told her it was doing so.  This isn't an instance where PRA, LLC surreptitiously recorded calls.  (Surreptitious recording might well qualify as highly offensive.)  No rational juror would find openly and transparently recording calls to be highly offensive.[317]

---

[312] Restatement (Second) of Torts § 652B (1977).

[313] *Fletcher*, 220 F.3d at 875 (applying Arkansas law).

[314] *McMullen*, 2015 Ark. 15, at 13–14, 454 S.W.3d at 209.

[315] *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 720, 74 S.W.3d 634, 644 (2002) (quoting *Fletcher*, 220 F.3d at 877).

[316] *Fletcher*, 220 F.3d at 877 (8th Cir. 2000).

[317] The Court notes that it is legal in Arkansas for a party to a phone call to record the phone call.  *See* Ark. Code Ann. § 5-60-120(a).  Thus, no rational juror could conclude that PRA, LLC "believe[d], or [was] substantially certain that [it] lack[ed] the necessary legal . . . permission" to record calls with Ms. Hammett.  *McMullen*, 2015 Ark. 15, at 14, 454 S.W.3d at 209; *see also Fletcher*, 220 F.3d at 876 (same).  So, with respect to the recorded-line issue, no rational juror could find an actionable intrusion upon Ms. Hammett's seclusion in the first place—let alone a highly offensive one.

With respect to the issue of PRA, LLC repeatedly calling Ms. Hammett without providing meaningful identification, this allegation is fatally flawed.  Except when Ms. Hammett did not give PRA, LLC an opportunity to do so, PRA, LLC identified itself on each substantive phone call PRA, LLC made within the three-year limitations period.[318]  For example, on the November 18, 2020 call, PRA, LLC identified itself and even told Ms. Hammett that she could send a written cease-and-desist request to PRA, LLC.[319]  PRA, LLC also identified itself as Portfolio Recovery Associates on the December 9, 2020 call.[320]  On this record, no rational juror could conclude that PRA, LLC repeatedly called Ms. Hammett without identifying itself.  So, no rational juror could find for Ms. Hammett on this aspect of her intrusion upon seclusion claim.

With respect to the issue of PRA, LLC's requesting that Ms. Hammett provide her birthdate or other personal information, no rational juror could find this to be highly offensive.  PRA, LLC asked Ms. Hammett to verify personal information that PRA, LLC already had.  Attempting to verify Ms. Hammett's identity (so the call could be with the right person) through the use of information that she voluntarily gave Capital One when she opened her credit card is entirely reasonable and unoffensive.  Indeed, as PRA, LLC argues, with limited exceptions, a debt collector cannot communicate with a third party about a consumer's debt without the consumer's consent.[321]  So, it was "reasonable for [PRA, LLC] to determine whether the person on the call [was Ms.

---

[318] *See Norris v. Bakker*, 320 Ark. 629, 631–32, 634, 899 S.W.2d 70, 71 (1995) (affirming grant of summary judgment based on the running of the three-year limitations period for invasion of privacy).  As discussed in footnote 256, there was one call where a PRA, LLC representative identified only himself (not PRA, LLC).  But, Ms. Hammett didn't give the representative a real opportunity to identify PRA, LLC on that call.  Ex. 6 (Call Trs.) to Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 107–6) at 28; Ex. 15 (Dec. 16, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).

[319] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 99) (Under Seal) ¶ 54.

[320] Ex. 15 (Dec. 9, 2020 Audio Recording) to Pl.'s Mot. to Compel (Doc. 100) (Under Seal).  While Ms. Hammett seems to quibble with the fact that PRA, LLC did not always identify itself as Portfolio Recovery Associates, *LLC*, no rational juror could find the absence of the LLC appendage as PRA, LLC not meaningfully identifying itself.

[321] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 76-1) (Under Seal at Doc. 121) at 47 (citing 15 U.S.C. § 1692c(b)).

Hammett] prior to engaging in its debt collection efforts by disclosing its identity and the purpose of the call."[322]  For her part, Ms. Hammett doesn't point to any case establishing that identification-verification requests are highly offensive.

With respect to PRA, LLC's counsel emailing Ms. Hammett a courtesy copy of PRA, LLC's answer at a different email address, no rational juror could conclude that this intruded upon Ms. Hammett's seclusion.  Ms. Hammett filed the instant lawsuit.  She thus opened herself up to receiving litigation-related correspondence from PRA, LLC or its counsel.  Similarly, Ms. Hammett used this email address in a public filing (her complaint in a California lawsuit).  Because Ms. Hammett included this email address in a public filing, a rational juror could only conclude that Ms. Hammett's behavior gave rise to "to an inference that [she] no longer expect[ed] to maintain privacy in" the email address she used in a public court filing.[323]  In any event, even if a rational juror could find that Ms. Hammett had a legitimate expectation of privacy in the email address, no rational juror could conclude that sending a copy of an answer to Ms. Hammett was highly offensive.

The closest Ms. Hammett comes to chinning the bar on her intrusion claim is the number of phone calls (45) that PRA, LLC placed to her -6000 number between November 18, 2020, and February 17, 2021.  In *CBM of Central Arkansas v. Bemel*, the Arkansas Supreme Court held that a jury verdict against a debt collector was sustainable because the jury could have found a "wrongful invasion of privacy."[324]  Over ten months, the debt collector sent "about 50 collection

---

[322] *Wisdom v. Portfolio Recovery Assocs., LLC*, No. 3:14-cv-299, 2015 WL 1892956, at *5 (N.D. Tex. Apr. 24, 2015).
[323] *Fletcher*, 220 F.3d at 877.
[324] 274 Ark. 223, 225, 623 S.W.2d 518, 519 (1981).

letters" to the plaintiff.[325]   The debt collector also called the plaintiff seventy times.[326]   Over the plaintiff's protests that she worked late nights and slept in, the debt collector "repeatedly called her" at 7:00 a.m. or later, "awakening her."[327]   The debt collector also placed "many calls" to the plaintiff's place of employment.[328]   On one of the calls to the plaintiff, the debt collector represented that it "was working out of the prosecuting attorney's office and was going to garnish[] her wages."[329]   The debt collector also admitted to customarily using fictitious names.[330]

*Bemel* just doesn't get Ms. Hammett where she needs to go.  It is true that the debt collector in *Bemel* called the plaintiff fewer times (on average) than PRA, LLC called Ms. Hammett.  But the number of calls by themselves was not dispositive.  The other conduct in *Bemel*—conduct that combined with the number of calls pushed the plaintiff in that case over the finish line—is conspicuously absent here.  PRA, LLC did not impersonate a prosecutor to scare Ms. Hammett.  PRA, LLC did not call Ms. Hammett's employer.  No record evidence hints at PRA, LLC using fictitious names when dealing with Ms. Hammett.  No record evidence suggests that PRA, LLC was aware that calling Ms. Hammett at reasonable times would disrupt her sleep.  At bottom, no rational juror could view this record and conclude that anything PRA, LLC did or said constitutes intrusion upon seclusion.

---

[325] *Id.* at 224, 623 S.W.2d at 519.

[326] *Id.*, 623 S.W.2d at 519.

[327] *Id.* at 225, 623 S.W.2d at 519.

[328] *Id.*, 623 S.W.2d at 519.

[329] *Id.*, 623 S.W.2d at 519.

[330] *Id.*, 623 S.W.2d at 519.

## II.  Ms. Hammett's Motion to Amend

As explained above, PRA, LLC is entitled to summary judgment on all claims against it in the First Amended and Supplemented Complaint.  Usually, such a ruling would be the end of the case, at least at the district court level.  But there's a wrinkle here that must be addressed.

Ms. Hammett filed her original Complaint on March 10, 2021.[331]  Then, on April 12, 2021, Ms. Hammett filed her First Amended and Supplemented Complaint (the "Operative Complaint").[332]  About eight months later, on November 15, 2021, Ms. Hammett moved to amend the Operative Complaint.[333]

In the proposed Second Amended and Supplemented Complaint (the "Proposed Second Amended Complaint") Ms. Hammett seeks to add two defendants—PRA Group, Inc. and Compumail Information Services, Inc. ("Compumail").[334]  With respect to PRA, Group, Inc., Ms. Hammett alleges that PRA, LLC is a wholly owned subsidiary of PRA Group, Inc.[335]  As such, Ms. Hammett alleges that PRA Group, Inc. is directly and vicariously responsible for PRA, LLC's acts.[336]  With respect to Compumail, Ms. Hammett alleges that it "worked in concert with PRA in at least [some] written collection activities" alleged in the Proposed Second Amended Complaint.[337]  Ms. Hammett also alleges that Compumail is liable for all of PRA's violations of federal law, essentially as an aider and abetter of PRA's violations.[338]

---

[331] Compl. (Doc. 1).

[332] First Am. & Suppl. Compl. (Doc. 6).

[333] Pl.'s Mot. to Amend (Doc. 33).  This proposed Second Amended and Supplemented Complaint came seven days before the November 22, 2021 deadline to add parties or amend pleadings. Sept. 16, 2021 Final Scheduling Order (Doc. 23) at 2.

[334] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) at 2 of 85.

[335] *Id.* ¶ 2.

[336] *Id.* ¶ 9.

[337] *Id.* ¶ 10.

[338] *Id.* ¶ 12.

The Proposed Second Amended Complaint presses all claims found in the Operative Complaint except for the claim for negligent infliction of emotional distress.[339]  It also purports to bring additional claims.  Specifically, the Proposed Second Amended Complaint adds claims against Defendants for (1) an FDCPA violation of 15 U.S.C. § 1692e(2)(A), (2) two violations of the Consumer Financial Protection Act, and (3) negligence under Arkansas law.[340]  PRA, LLC opposes Ms. Hammett's Motion to Amend.[341]  PRA, LLC principally argues that the Motion should be denied because "the proposed substantive amendments would be futile."[342]  For the most part, PRA, LLC is correct.  So most of the Proposed Second Amended Complaint will not be allowed.  There is, however, one exception.  Ms. Hammett's proposed amendment is appropriate insofar as it adds a claim against PRA, LLC for a violation of 15 U.S.C. 1692e(2)(A).

## A.  The Proposed Second Amended Complaint

The Proposed Second Amended Complaint weighs in at 406 paragraphs.[343]  The Proposed Second Amended Complaint almost exclusively alleges joint conduct, be it PRA, LLC along with PRA Group, Inc. or all three purported defendants combined.   When the Proposed Second Amended Complaint alleges joint conduct by PRA, LLC and PRA Group, Inc., it refers to the entities collectively as "PRA."[344]  When the Proposed Second Amended Complaint alleges joint conduct by PRA and Compumail, it refers to them collectively as "Defendants."[345]  Nevertheless,

---

[339] *Compare* First Am. & Suppl. Compl. (Doc. 6) ¶¶ 296–99 (alleging negligent infliction of emotional distress), *with* Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Motion to Amend (Doc. 33-1) (omitting any allegation of negligent infliction of emotional distress).

[340] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶¶ 315–319, 374–84.

[341] Def.'s Resp. to Pl.'s Mot. to Am. (Doc. 41) at 3.

[342] *Id.*

[343] *See* Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1).

[344] *Id.* ¶ 9.  In the Operative Complaint, Ms. Hammett used "PRA" to mean PRA, LLC only.

[345] *Id.* ¶ 14.

the Proposed Second Amended Complaint does present some individualized factual allegations with respect to both PRA Group, Inc. and Compumail.

According to the Proposed Second Amended Complaint: (1) PRA Group, Inc. is a Delaware LLC "with its headquarters in Virginia;"[346] (2) PRA Group, Inc. is one of "the largest acquirers of nonperforming loans in the world;"[347] and (3) PRA Group, Inc. owns PRA, LLC.[348] The Proposed Second Amended Complaint further alleges that the Consumer Financial Protection Bureau ("CFPB") has directed PRA Group, Inc. to assume the ultimate responsibility for overseeing that PRA, LLC complies with the TCPA and FDCPA.[349]   According to the Proposed Second Amended Complaint, this direction came by way of a Consent Order entered into between PRA, LLC and the CFPB.[350]   And through this Consent Order, "PRA Group, Inc. has exercised control over" PRA, LLC.[351]   The Proposed Second Amended Complaint says that PRA Group, Inc. acknowledged its responsibility for PRA, LLC when it filed a joint answer with PRA, LLC in a different lawsuit.[352]   Finally, according to the Proposed Second Amended Complaint, PRA Group, Inc. controls PRA, LLC because PRA Group, Inc. filed a "2020 Annual Report" that defined PRA Group, Inc. to include its subsidiaries.[353]

According to the Proposed Second Amended Complaint, Compumail is "a debt collector."[354]   The Proposed Second Amended Complaint alleges that: (1) Compumail is a

---

[346] *Id.* ¶ 37.

[347] *Id.* ¶ 48.

[348] *Id.* ¶ 2.

[349] *Id.* ¶ 3.

[350] *Id.*

[351] *Id.*

[352] *Id.* ¶ 5.

[353] *Id.* ¶¶ 6–7.

[354] *Id.* ¶ 51.

"California corporation" headquartered in Concord, California;[355] and (2) Compumail "sends a significant number of collection letters on behalf of several debt collectors including PRA to citizens of Arkansas."[356]  The Proposed Second Amended Complaint further alleges the following.  "On its website, Compumail explains . . . that it does not just print and post what the debt collector tells it to print and post.  It uses its own experience in debt collection to help create mailings that will increase the response rates and save some of the costs of returned mail."[357]  Compumail worked with PRA "in at least [the] written collection activities complained of" in the Proposed Second Amended Complaint.[358]  Compumail "appears to process returned mail, as the letters sent on behalf of PRA have a Compumail return address."[359]  And Compumail "was given a copy [of the aforementioned Consent Order] and knew it was helping PRA violate it."[360]

The Proposed Second Amended Complaint brings federal and state law claims.  Under Federal law, the Proposed Second Amended Complaint alleges that PRA (PRA, LLC and PRA Group, Inc. combined) violated thirteen provisions of the FDCPA: 15 U.S.C. §§ 1692b, 1692c(a)(1), 1692c(c), 1692d, 1692d(5), 1692e(2)(A), 1692e(10), 1692e(11), 1692e(13), 1692e(14), 1692g(a)(3), 1692g(a)(4), and 1692g(a)(5).[361]  Ms. Hammett alleges that Compumail joined PRA in the alleged violations of 15 U.S.C. §§ 1692d, 1692e(2)(A), 1692e(10), 1692e(13), and 1692e(14).[362]

---

[355] *Id.* ¶ 37.

[356] *Id.* ¶ 52.

[357] *Id.* ¶ 184.

[358] *Id.* ¶ 10.

[359] *Id.* ¶¶ 11, 174, 183.

[360] *Id.* ¶ 360.

[361] *Id.* ¶¶ 302–43.

[362] *Id.* ¶¶ 312, 316, 321, 334, 336.

With the exception of Ms. Hammett's new claim under 15 U.S.C. § 1692e(2)(A), Ms. Hammett alleges the same FDCPA violations as she does in the Operative Complaint.[363]  As to Ms. Hammett's new claim under 15 U.S.C. § 1692e(2)(A), Ms. Hammett alleges that Defendants violated this provision by sending her a letter that said, "Plaintiff owed $2,297.63 to the LL[C] when in fact Plaintiff owed nothing to the LLC."[364]  For the other FDCPA claims, Ms. Hammett's factual allegations are nearly identical to the Operative Complaint.  However, Ms. Hammett does add more facts to allege a second theory of recovery under 15 U.S.C. § 1692e(10).[365]  On that front, Ms. Hammett says that Defendants are being deceptive by using discovery tools in litigation "to help verify the alleged debt" Ms. Hammett owed.[366]

The Proposed Second Amended Complaint includes a few other federal claims as well.  As in the Operative Complaint, Ms. Hammett alleges that PRA violated the TCPA.[367]  Ms. Hammett's factual allegations underlying the TCPA claims remain unchanged from the Operative Complaint. It also seems as though Ms. Hammett alleges that Defendants' conduct violated various provisions of the CFPA.[368]  Specific factual allegations concerning alleged violations of the CFPA are conspicuously absent.

As to state law claims, the facts and claims alleged in the Proposed Second Amended Complaint are similar to the Operative Complaint.  While the Operative Complaint alleges outrage, negligent infliction of emotional distress, and invasion of privacy by intrusion upon seclusion, the

---

[363] *Compare* First Am. & Suppl. Compl. (Doc. 6) ¶¶ 253, 255, 257, 261, 263, 265, 268, 270, 271, 273, 275, 278, *with* Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶¶ 302–43.

[364] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶ 316.

[365] *See supra* at pp. 39–40.

[366] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶¶ 323–30.

[367] *Id.* ¶ 344.

[368] *Id.* ¶¶ 12, 317.

Proposed Second Amended Complaint alleges the torts of outrage, negligence, and invasion of privacy by intrusion upon seclusion.[369]  As will become apparent below, the new negligence claim is really an attempt to dress up or disguise the old claim for negligent infliction of emotional distress.

With respect to the tort of outrage, according to the Proposed Second Amended Complaint, the "Defendants worked in a conspiracy to collect an alleged debt that could not be verified, each ratifying and adopting the actions of each other."[370]  PRA persistently made phone calls to Ms. Hammett, waking her from "much needed sleep on several occasions."[371]  These calls, plus backdated letters that Defendants sent to Ms. Hammett, caused her to return to therapy and suffer "cognitive dissonance."[372]  This conduct, according to the Proposed Second Amended Complaint, was "extreme and outrageous."[373]

With respect to the negligence claim, the Proposed Second Amended Complaint says that the Defendants breached their "legal duty arising from the FDCPA to protect Plaintiff as an alleged debtor from harm, by verifying debt, notifying the alleged debtor of her rights, mailing verification of debt and the original creditor's address when requested[,] and not subjecting their 'customer' to harassment."[374]

With respect to the invasion-of-privacy-by-intrusion-upon-seclusion claim, the Proposed Second Amended Complaint says that PRA's refusal to stop calling Ms. Hammett on a recorded

---

[369] *Id.* ¶¶ 346–404.

[370] *Id.* ¶ 346.

[371] *Id.* ¶¶ 348, 361.

[372] *Id.* ¶¶ 351–52.

[373] *Id.* ¶ 366.

[374] *Id.* ¶ 377.

line was an invasion of her privacy.[375]  PRA forced Ms. Hammett "to be taped in order to make

the calls stop."[376]  When PRA called, Ms. Hammett said that she was "Laura Lynn."[377]  PRA would

still demand that Ms. Hammett tell PRA her birthday.[378]  PRA had no right to make this demand

or to require Ms. Hammett to "lend her voice to [PRA's] recordings."[379]  All of this conduct,

according to the Proposed Second Amended Complaint, infringed upon Ms. Hammett's

solitude.[380]

The Proposed Second Amended Complaint also alleges facts concerning PRA's conduct

during this litigation to undergird Ms. Hammett's intrusion-upon-seclusion claim.[381]  According

to the Proposed Second Amended Complaint, PRA's attorney emailed Ms. Hammett at a second

email address she did not own until 2007, "long after she signed any alleged agreement with

Capital One."[382]  PRA, LLC also abused "the litigation by telling the Court that [Ms.] Hammett

was demanding no less than one million dollars for emotional distress damages."[383]  PRA also has

access, through this litigation, to Ms. Hammett's likeness.[384]  Ms. Hammett cannot control or

monitor whether PRA uses her likeness and is thus "embarrassed and angry that PRA might use

her likeness for training purposes."[385]

---

[375] *Id.* ¶ 385.

[376] *Id.* ¶ 386.

[377] *Id.* ¶ 388.

[378] *Id.* ¶ 389.

[379] *Id.* ¶ 390.

[380] *Id.* ¶ 393.

[381] *Id.* ¶¶ 395–96, 398–401.

[382] *Id.* ¶¶ 395–96.

[383] *Id.* ¶ 398.

[384] *Id.* ¶ 401.

[385] *Id.*

### B.  Legal Standard

Federal Rule of Civil Procedure 15 governs Ms. Hammett's Motion to Amend.[386]  Under Rule 15(a), "a party is entitled to amend his [or her] complaint one time as a matter of course within specified time frames."[387]  After this, "a party may amend its pleading only with the opposing party's written consent or the court's leave.[388]  PRA, LLC opposes Ms. Hammett's Motion.[389]  So Ms. Hammett needs leave of the Court.  Under Rule 15(a)(2), "[t]he court should freely give leave when justice so requires."  Rule 15(a) creates a liberal amendment standard. "However, there is no absolute right to amend and a court may deny the motion based upon a finding of undue delay, bad faith . . . , or futility."[390]  "An amendment is futile if the amended claim 'could not withstand a motion to dismiss under Rule 12(b)(6).'"[391]  And "[t]o survive a motion to dismiss for failure to state a claim [under Rule 12(b)(6)], the complaint must show the plaintiff is entitled to relief by alleging sufficient factual matter, accepted as true to state a claim to relief that is plausible on its face."[392]

---

[386] As noted above, Ms. Hammett filed her Motion to Amend before the November 22, 2021 deadline to add parties or amend pleadings in the Court's then operative Final Scheduling Order.  *See* Mot. to Am. (Doc. 33) (showing filing date as November 15, 2021); Sept. 16, 2021 Final Scheduling Order (Doc. 23) at 2 (setting November 22, 2021 as the deadline to seek leave to add parties or amend pleadings).  Thus, the Court need not modify its scheduling order to allow amendment.  So, the "good cause" standard under Federal Rule of Civil Procedure 16(b)(4) does not apply here.

[387] *Rivera v. Bank of Am., N.A.*, 993 F.3d 1046, 1051 (8th Cir. 2021).

[388] Fed. R. Civ. P. 15(a)(2).

[389] Def.'s Resp. to Pl.'s Mot. to Am. (Doc. 41).

[390] *Baptist Health v. Smith*, 477 F.3d 540, 544 (8th Cir. 2007).

[391] *Hillesheim v. Myron's Cards & Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 719 (8th Cir. 2014)).

[392] *Id.* (internal quotations and citations omitted).  The Court bears in mind that "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (internal quotations and citation omitted).

### C. Adding Compumail Would be Futile

The Proposed Second Amended Complaint fails to assert any factual allegations to support plausible claims against Compumail for FDCPA violations or Arkansas torts.[393]  Let's start with the FDCPA.  As its full name suggests, the FDCPA regulates debt collectors.  The Proposed Second Amended Complaint alleges that Compumail is a debt collector.[394]  But the Proposed Second Amended Complaint alleges no facts to support the unadorned legal conclusion that Compumail is a debt collector.  Taking as true the allegations in the Proposed Second Amended Complaint, as the Court would on a Rule 12(b)(6) motion, Compumail at most provides various services to debt collectors, including PRA, LLC.  That is not enough to plausibly assert that Compumail is a debt collector and therefore within the FDCPA's ambit.  It follows that allowing an amendment to add Compumail as a defendant for FDCPA claims would be futile.

Likewise, the Proposed Second Amended Complaint does not allege facts sufficient to state a claim against Compumail for state-common-law torts.  The Proposed Second Amended Complaint alleges that Compumail is liable for the torts of outrage and negligence.[395]  The factual allegations offered to support these state law claims concern three letters that Ms. Hammett received.[396]  According to the Proposed Second Amended Complaint, Ms. Hammett received a backdated debt-dispute letter that included an allegedly deceptive affidavit.[397]  Ms. Hammett also received a backdated letter addressed to Laura Lyman (not Laura Lynn) that said PRA, LLC "has

---

[393] Def.'s Resp. to Pl.'s Mot. to Am. (Doc. 41) at 6.

[394] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶ 11.

[395] *Id.* ¶¶ 346–84.  Ms. Hammett does not allege that Compumail committed invasion of privacy.  *See id.* ¶ 385 (bringing invasion-of-privacy claim against only PRA, LLC and PRA Group, Inc.).

[396] *See id.* ¶ 352.

[397] *Id.* ¶ 321; Ex. A to Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) at 77–82.

concluded its investigation of your dispute and is closing your account."[398]  Finally, according to the Proposed Second Amended Complaint, Ms. Hammett received a letter addressed to her, which said that PRA, LLC "has concluded its investigation of your dispute and is closing your account."[399]

These allegations do not plausibly assert that Compumail is liable for one or more torts. With respect to the tort of outrage, sending these letters is nowhere near enough for a viable cause of action under Arkansas law.  Assuming Compumail did what Ms. Hammett said it did, such conduct is not anywhere in the vicinity of "conduct [that] was 'extreme and outrageous,' was 'beyond all possible bounds of decency,' and was 'utterly intolerable in a civilized community.'"[400]

With respect to negligence, the Proposed Second Amended Complaint asserts a novel legal premise that Arkansas law would recognize a duty arising out of the FDCPA.[401]  Under Arkansas law, "[i]t is well settled that the law of negligence requires as [an] essential element[] that the plaintiff show that a duty was owed . . . ."[402]  Even if a duty could arise out of the FDCPA, it would be of no moment with regard to Compumail.  As noted above, the FDCPA regulates debt collectors.  The Proposed Second Amended Complaint fails to plead facts that plausibly assert that Compumail is a debt collector.  So Compumail would not owe such a duty because it is not plausibly subject to the FDCPA.

---

[398] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶¶ 249–55, 258–59.

[399] Ex. B to Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) at 84.

[400] *McQuay*, 331 Ark. at 470, 963 S.W.2d at 585 (quoting *Angle*, 328 Ark. at 722, 945 S.W.2d at 937).

[401] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶ 377.

[402] *Lacy v. Flake & Kelley Mgmt., Inc.*, 366 Ark. 365, 367, 235 S.W.3d 894, 896 (2006).

### D.  Adding PRA Group, Inc. Would be Futile

It would be futile to allow Ms. Hammett to add PRA Group, Inc. as a defendant because the factual allegations in the Proposed Second Amended Complaint are insufficient to state viable causes of action against PRA Group, Inc.

According to the Proposed Second Amended Complaint, PRA Group, Inc. is directly and vicariously responsible for "all acts taken by its subsidiary [PRA, LLC]."[403]  For this reason, the Proposed Second Amended Complaint by and large collapses PRA, LLC and PRA Group, Inc. into one actor ("PRA") for purposes of claims and factual allegations.[404]  This is essentially an implicit legal conclusion that PRA Group, Inc. and PRA, LLC are one in the same.  Thus, the Proposed Second Amended Complaint seeks to pierce PRA, LLC's corporate veil to make PRA Group, Inc. liable for PRA, LLC's acts.[405]

Arkansas law "is viewed to determine whether and how to pierce the corporate veil."[406]  Under Arkansas law, "[i]t is a nearly universal rule that a corporation and its stockholders are separate and distinct entities, even though the stockholder may own the majority of the stock."[407]  Thus, "[a] parent corporation is not liable for the [acts] of its subsidiary merely because the parent holds the controlling interest or because the two are managed by the same officers."[408]  In some circumstances, though, "the corporate entity may be disregarded or looked upon as the alter ego

---

[403] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶ 9.

[404] *Id.*

[405] *See id.* ¶ 4 (stating that, "[w]hen the doctrine of separate legal personality is being abused to perpetrate fraud or avoid existing legal obligations, the courts may be prepared to lift the corporate veil, look behind the corporate structure, impute [a] subsidiary's conduct to the parent, and hold the parent company liable on the basis of vicarious liability for acts of its subsidiary) (internal quotations and citation omitted).

[406] *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003) (applying Arkansas law).

[407] *K.C. Props. of Nw. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 32, 280 S.W.3d 1, 15 (2008).

[408] *Epps*, 327 F.3d at 649.

60

of the principal stockholder . . . ."[409]  This happens "only when the privilege of transacting business in corporate form has been illegally abused to the injury of a third person that the corporate entities should be disregarded."[410]

The Proposed Second Amended Complaint does not allege any facts that plausibly assert that PRA Group, Inc. has "illegally abused" PRA, LLC to the injury of Ms. Hammett.  For instance, the Proposed Second Amended Complaint does not allege that PRA Group, Inc. shuttered PRA, LLC when Ms. Hammett filed this lawsuit.[411]  The Proposed Second Amended Complaint does not allege that any damages Ms. Hammett may be awarded because of PRA, LLC's conduct will not be paid because PRA, LLC has no assets.  The Proposed Second Amended Complaint does not allege that PRA Group, Inc. intermingles funds with PRA, LLC and essentially treats PRA, LLC as a personal piggybank.

In large part, the Proposed Second Amended Complaint hangs its hat on the allegation that PRA Group, Inc. agreed to be responsible for PRA, LLC's compliance with the FDCPA through a Consent Order between the CFPB and PRA, LLC.[412]  The Consent Order had an effective date of September 9, 2015, and terminated five years later.[413]  The Consent Order used some defined

---

[409] *Id.*

[410] *Id.*

[411] *See Winchel v. Craig*, 55 Ark. App. 373, 381–82, 934 S.W.2d 946, 950–51 (1996) (stating that veil-piercing was supported by substantial evidence when the evidence showed that a plaintiff "was injured by [equipment] manufactured by the corporation . . . ; that [defendants] were its sole incorporators, stockholders, and officers; that the corporation had no liability insurance in case someone was hurt by its equipment; that the [defendants] dissolved [the corporation] and sold or transferred its assets" after the plaintiff sued the corporation).

[412] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶ 3.

[413] *See* Ex. E (Consent Order) to Pl.'s Mot. for Partial Summ. J. (Doc. 39-5) at 5, 61.  The Court uses the pagination found on the Clerk of this Court's file stamp.  The Court takes judicial notice of the Consent Order because it is a matter of public record that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(2).  Additionally, the Eighth Circuit has long permitted consideration at the motion-to-dismiss stage of "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings."  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)).  Because the futility inquiry under Rule 15(a)(2) overlaps with the inquiry a court undertakes when deciding

terms.  It defined "Respondent" to mean "Portfolio Recovery Associates, LLC."[414]  It defined the "Board" to mean "the duly elected and acting Board of Directors of Respondent's parent company, PRA Group, Inc."[415]   The  Consent  Order  placed  some  responsibilities  on  the  Board.[416]  Importantly, "[t]he Board [had] the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with applicable Federal consumer financial law and [the] Consent Order."[417]

The Consent Order does not alter the Court's conclusion on whether the Proposed Second Amended Complaint plausibly asserts that PRA, LLC's veil could be pierced in this case.  To be sure, PRA Group, Inc. accepted responsibility for PRA, LLC's compliance with federal law and the Consent Order.  This acceptance of responsibility leads to the reasonable inference that PRA Group, Inc. exercises some level of control over PRA, LLC.  Otherwise, how could PRA Group, Inc. agree to be responsible for PRA, LLC's compliance with federal law?  But that type of control is not sufficient under Arkansas law to pierce the corporate veil (or proceed under an alter ego theory).  What is required is the illegal abuse of the corporate form.  The Consent Order says nothing to suggest, let alone plausibly assert, that PRA Group, Inc. "illegally abused" PRA, LLC's corporate form "to the injury of a third party"—much less to the injury of Ms. Hammett.[418]  As such, the Consent Order does not get Ms. Hammett over the futility hurdle.

---

a motion to dismiss, the Court can (and will) consider the Consent Order.

[414] Ex. E (Consent Order) to Pl.'s Mot. for Partial Summ. J. (Doc. 39-5) at 6.

[415] *Id.* at 4.

[416] *See, e.g.*, *id.* at 44 (stating that "[t]he Board must review all submissions . . . required by this Consent Order prior to submission to the" CFPB).

[417] *Id.* at 45.

[418] *K.C. Props*, 373 Ark. at 32, 280 S.W.3d at 15.

In any event, allowing the amendment with respect to PRA Group, Inc. would ultimately make zero difference in the outcome of this case. Ms. Hammett's claims against PRA Group, Inc. are wholly derivative of her claims against PRA, LLC.[419] This means that PRA Group, Inc. could only be liable to the same extent that PRA, LLC is liable. Discovery is now closed and, as shown above, PRA, LLC has established that no rational juror could find for Ms. Hammett on any claims (in the Operative Complaint) against PRA, LLC. Practically speaking, the same would hold true for PRA Group, Inc. if the Court allowed an amendment to add it. Moreover, there is nothing to suggest that any additional discovery from PRA Group, Inc. would alter the Court's summary-judgment analysis. Ms. Hammett could have sought third-party discovery from PRA Group, Inc.; she did not do so. And unless PRA Group, Inc. wanted additional discovery, there would be no justification for ordering further discovery in this case on the merits issues.[420]

### E. Adding Claims Under the CFPA Would be Futile

Very liberally construing the Proposed Second Amended Complaint, it seeks to add claims under the Consumer Financial Protection Act (CFPA).[421] Specifically, the Proposed Second

---

[419] At the summary-judgment hearing, the Court asked Ms. Hammett, "[I]n terms of what . . . you're saying PRA Group has done wrong, . . . it's the same claims and conduct as it is against [PRA, LLC] . . . , correct?" Apr. 26, 2022 Hr'g Tr. (Doc. 157) at 9:18–24. Ms. Hammett said, "Yes." *Id.* at 9:25.

[420] Indeed, if amending the Operative Complaint to include PRA Group, Inc. would cause or require additional rounds of discovery, leave to amend under Federal Rule of Civil Procedure 15(a)(2) would be inappropriate. In the circumstances of this case, there was undue delay in proposing to add PRA Group, Inc. Ms. Hammett obviously knew about the Consent Order back when she filed her First Amended and Supplemented Complaint. *See* First Am. and Suppl. Compl. (Doc. 6) ¶ 158 (Ms. Hammett referencing the 2015 Consent Order). The Consent Order is the principal basis for her wanting to add PRA Group, Inc. now. But she waited nearly eight months to seek leave to add PRA Group, Inc. There is no justification for this delay. As the Eighth Circuit notes, undue delay coupled with prejudice to the non-movant is a "[p]roper justification" for denying a motion to amend under Rule 15(a)(2). *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998). Going through additional discovery would significantly prejudice PRA, LLC, which has already had to go through one full round of discovery on these issues. Of course, prejudice to PRA, LLC would have to be weighed against prejudice to Ms. Hammett. *Id.* Here, it is hard to see what prejudice she would suffer by not getting to bring identical claims based on the same facts against PRA Group, Inc. If she wins against PRA, LLC, there is no indication that she could not recover her full damages from PRA, LLC. If she loses against PRA, LLC, the same reason for the loss would preclude recovery against PRA Group, Inc. Ultimately, the undue delay coupled with prejudice to PRA, LLC would justify the denial of the Motion to Amend.

[421] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶¶ 12, 317.

Amended Complaint alleges that "Compumail is . . . liable for violations of the same [f]ederal [l]aws as PRA pursuant to 12 U.S.C. [§] 5536(c)(3)."[422]  The Proposed Second Amended Complaint also alleges that Defendants violated "12 U.S.C. §§ 5531(a) and 5536(a) and (c)."[423]

Amending the Operative Complaint to include claims under the CFPA would be futile because the CFPA does not provide a private right of action.  To begin with, the CFPA does not include an express private right of action.  When Congress does not provide for such a right of action in a statute, that ordinarily ends the inquiry, and a private citizen cannot sue to enforce the federal statute.  There is an exception to this rule, however—a judicially implied private right of action.  A line of Supreme Court cases, beginning with *Alexander v. Sandoval*, has made quite clear that judicially implied private rights of action are now extremely disfavored.[424]  If Congress wants private litigants to be able to enforce federal statutes, Congress should express that desire in the statute.

*Sandoval* and its progeny don't entirely foreclose the possibility of implied private rights of action.  However, those cases do set pretty strict requirements for when a court may imply a private right of action to enforce a statutory provision.  First, Congress must use rights-creating language in the statutory provision at issue.[425]  Second, Congress must provide for a private remedy.[426]  Both are necessary before a private party can enforce a federal statute.

The Court assumes (without deciding) that the CFPA contains rights-creating language. Nevertheless, there is no clear congressional intent to provide a private remedy.  The CFPA created

---

[422] *Id.* ¶ 12.

[423] *Id.* ¶ 317.

[424] 532 U.S. 275 (2001); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008); *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

[425] *Sandoval*, 532 U.S. at 286–88.

[426] *Id.*

the Consumer Financial Protection Bureau ("CFPB").[427]  "If any person violates a Federal consumer financial law, the [CFPB] may . . . commence a civil action against such person to impose a civil penalty or to seek all appropriate legal and equitable relief . . . ."[428]  The CFPA also authorizes state attorneys general to sue in the name of states "to enforce provisions of" the CFPA.[429]  These enforcement mechanisms are telling because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."[430]  More telling, though, is the CFPA's silence regarding private remedies.  This silence speaks volumes because it means the Court cannot imply a private right of action to enforce the CFPA.

A plethora of other district court judges have reached the same conclusion.[431]  Ms. Hammett has not provided the Court with any contrary authority, and the Court has found none.  Therefore, it would be futile to allow Ms. Hammett to amend the Operative Complaint to add claims under the CFPA.

### E.  Adding a Claim for Negligence Would be Futile

The Operative Complaint has a claim against PRA, LLC for negligent infliction of emotional distress.[432]  The Proposed Second Amended Complaint says that "Arkansas has not prior to this recognized a claim for negligent infliction of emotional distress without a physical

---

[427] 12 U.S.C. § 5491(a).

[428] *Id.* at § 5564.

[429] *Id.* at § 5552.

[430] *Sandoval*, 532 U.S. at 290; *see also Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 457–58 (1974); *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.").

[431] *See, e.g.*, *Zubair v. Conedison Co. of NY*, No. 1:20-cv-1313, 2020 WL 2857206, at *2 (S.D.N.Y June 1, 2020) ("Courts within this Circuit have held that the CFPA provides no private right of action.") (collecting cases); *Mayall v. Randall Firm, PLLC*, No. 1:13-cv-00166, 2017 WL 3432033, at *2 (D. Utah Aug. 9, 2017) ("[B]ecause the CFPA grants enforcement authority to the [CFPB] and to state attorneys general, the court finds, as other courts have, that the CFPA does not create any private rights of action."); *Cornwall v. Centerstate Bank of Fla., N.A.*, No. 8:16-cv-1249, 2016 WL 3219725, at *1 (M.D. Fla. June 10, 2016) (holding that the CFPA "does not authorize a private cause of action").

[432] First Am. & Suppl. Compl. (Doc. 6) ¶ 296–301.

causation."[433]    So, instead, the Proposed Second Amended Complaint alleges regular negligence.[434]    On that front, the Proposed Second Amended Complaint alleges that the "Defendants as debt collectors had a legal duty arising from the FDCPA to protect Plaintiff as an alleged debtor from harm[] by verifying debt, notifying the alleged debtor of her rights, mailing verification of debt and the original creditor's address when requested and not subjecting their 'customer' to harassment."[435]    The problem for Ms. Hammett is that, as explained below, the FDCPA does not give rise to a duty under Arkansas common law.

"Under Arkansas law, in order to prevail on a claim of negligence, the plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries."[436]    "Duty is a concept that arises out of the recognition that relations between individuals may impose upon one a legal obligation for the other."[437]    "[W]hat duty, if any, is owed a plaintiff alleging negligence is always a question of law . . . ."[438]    The Arkansas Supreme Court has not weighed in on whether the FDCPA imparts on debt collectors a common-law duty in tort.    Therefore, the Court must predict whether the Supreme Court would recognize such a duty.[439]    The Court concludes that the Arkansas Supreme Court would not recognize a duty arising out of the FDCPA.

---

[433] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶ 375.

[434] *Id.* ¶¶ 374–83.

[435] *Id.* ¶ 377.

[436] *Yanmar Co., Ltd. v. Slater*, 2012 Ark. 36, at 16, 386 S.W.3d 439, 449.

[437] *Kowalski v. Rose Drugs of Dardanelle, Inc.*, 2011 Ark. 44, at 7, 378 S.W.3d 109, 115.

[438] *Yanmar*, 2012 Ark. 36, at 16, 386 S.W.3d at 449.

[439] *See Progressive N. Inc. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010) (explaining that federal courts, when sitting in diversity jurisdiction, "must attempt to predict how the highest [state] court would resolve" an undecided question of state law).

The Arkansas Supreme Court has held fast to its insistence that "the violation of a statute is only evidence of negligence and does not constitute negligence per se."[440]  In other words, a statutory violation "is evidence a jury may consider in determining whether a defendant is guilty of negligence."[441]  So, under Arkansas law, a plaintiff that proves a statutory violation does not automatically prevail on a negligence claim.  A statute itself, then, cannot create a common law duty—at least as a general matter.  Without any indication from the Arkansas Supreme Court that the FDCPA is somehow an exception to the general rule, the Court predicts that the Arkansas Supreme Court would not recognize a common-law duty in tort arising from the FDCPA.  Without a duty owed, there can be no negligence.  Allowing an amendment to add a negligence claim would thus be futile.

Even if the Court's prediction is wrong, the Proposed Second Amended Complaint still fails to state a viable cause of action for negligence because the Proposed Second Amended Complaint does not allege facts to plausibly assert that Ms. Hammett suffered a physical injury for which compensable damages are available.  The Arkansas Supreme Court "has long held that 'there can be no recovery for fright or mental pain and anguish caused by negligence, where there is no physical injury.'"[442]  "The reason that mental suffering unaccompanied by physical injury is not considered as an element of recoverable damages is that it is deemed to be too remote, uncertain, and difficult of ascertainment; and the reason that such suffering is allowed as an element of damages, when accompanied by physical injury, is that the two are so intimately connected that both must be considered because of the difficulty in separating them."[443]

---

[440] *Cent. Okla. Pipeline, Inc. v. Hawk Field Servs., LLC*, 2012 Ark. 157, at 17, 400 S.W.3d 701, 712.

[441] *Berkeley Pump Co. v. Reed-Joseph Land Co.*, 279 Ark. 384, 397, 653 S.W.3d 128, 134 (1983).

[442] *Dowty v. Riggs*, 2010 Ark. 465, at 7, 385 S.W.3d 117, 121 (quoting *Erwin v. Milligan*, 188 Ark. 658, 663, 67 S.W.2d 592, 594 (1934)).

[443] *Id.* (quoting *Chi., Rock Island & Pac. Ry. Co. v. Caple*, 207 Ark. 52, 179 S.W.2d 151, 154 (1944)).

Unsurprisingly, to have a physical injury, there must be "a physical impact."[444]  And to be clear, "it is the mental anguish that flows from the *injury* and not the mental anguish preceding the injury that may be recoverable . . . ."[445]

The Proposed Second Amended Complaint alleges no facts to plausibly assert that Ms. Hammett suffered a compensable physical injury.  The Proposed Second Amended Complaint alleges that "PRA's conduct woke Plaintiff from much needed sleep and caused her mind to race so she could not fall back to sleep."[446]  Placing a phone call that causes someone's mind to race does not plausibly generate a physical impact and thus does not plausibly give rise to a physical injury in this case.  The Proposed Second Amended Complaint then alleges that Ms. Hammett's "lack of sleep contributed to the excruciating pain she suffered from 'Frozen Shoulder Syndrome.'"[447]  Assuming that is true, this exacerbation of pain flows from the mental anguish of not being able to sleep because of the phone calls—not from a preceding physical injury.  Allowing an amendment to add this claim would thus be futile for this reason as well.

### F.  Adding a Claim Under 15 U.S.C. § 1692e(10) Would be Futile

The Operative Complaint alleges a violation of 15 U.S.C. § 1692e(10) based on PRA, LLC's sending Ms. Hammett a debt-dispute letter that included an allegedly deceptive affidavit.[448]  The Proposed Second Amended Complaint seeks to provide an additional factual basis to establish a separate violation of this provision.[449]  The Proposed Second Amended Complaint alleges that PRA's "use of discovery tools [in litigation] to try to elicit material to help verify the alleged debt

---

[444] *M.B.M. Co., Inc. v. Counce*, 268 Ark. 269, 273, 596 S.W.3d 681, 684 (1980).

[445] *Caple*, 207 Ark. 52, 179 S.W.2d at 154.

[446] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶ 379.

[447] *Id.* ¶ 380.

[448] First Am. & Suppl. Compl. (Doc. 6) ¶¶ 265–66.

[449] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶¶ 322–31.

is deceptive, false and misleading."[450]  The Proposed Second Amended Complaint alleges that, on November 8, 2021, PRA, LLC's counsel "sent a letter to Hammett."[451]  The letter sought responses to various discovery requests concerning the alleged debt Ms. Hammett owed to PRA, LLC.[452]

There are at least two reasons why allowing this additional theory of liability under 15 U.S.C. § 1692e(10) would be futile.  First, as noted multiple times, the FDCPA imposes liability on debt collectors.  The Proposed Second Amended Complaint alleges no facts that plausibly assert that PRA, LLC's lawyer is a debt collector.  The Supreme Court makes clear that the FDCPA "applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation."[453]  The Proposed Second Amended Complaint does not provide any facts relevant to the question of whether PRA, LLC's lawyer in this case regularly conducts debt-collection activity.  PRA, LLC's counsel did not launch a debt-collection suit in this case.  And the Proposed Second Amended Complaint does not plausibly assert that PRA, LLC's counsel ever has launched such a suit, let alone regularly launches such suits.

Second, to establish a violation under § 1692e, a plaintiff must show that a communication was "in connection with the collection of any debt."[454]  As mentioned above, the Eighth Circuit uses the animating-purpose test to determine whether a communication was sent in connection with the collection of any debt.  "Under [that] test, 'for a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor.'"[455]  The instant case revolves around Ms. Hammett's numerous claims against

[450] *Id.* ¶ 323.

[451] *Id.* ¶ 325.

[452] *Id.* ¶¶ 326–30.

[453] *Heintz v. Jenkins*, 514 U.S. 291, 299 (1995).

[454] *McIvor*, 773 F.3d at 913.

[455] *Heinz*, 3 F.4th at 1112 (quoting *McIvor*, 773 F.3d at 914).

69

PRA, LLC.  It does not include a counterclaim against Ms. Hammett for any alleged debt.  The Proposed Second Amended Complaint alleges that Ms. Hammett received the allegedly deceptive letter from PRA, LLC's lawyer during the discovery process in the instant case.[456]  Routine discovery requests from PRA, LLC are not plausibly characterized as an attempt to induce Ms. Hammett to pay any debt.  Thus, the Proposed Second Amended Complaint does not plausibly assert that PRA, LLC's lawyer sent this letter in connection with the collection of any debt.

### G.  Adding a Claim Under 15 U.S.C. § 1692e(2)(A) Would Not be Futile

The Proposed Second Amended Complaint seeks to add a claim under 15 U.S.C. § 1692e(2)(A).[457]  With respect to this claim, the Proposed Second Amended Complaint alleges that Defendants wrote Ms. Hammett telling her she "owed $2,297.63 to the LL[C] when in fact Plaintiff owed nothing to the LLC."[458]  Section 1692e(2)(A) prohibits the "false representation of the character, amount, or legal status of any debt."

On a motion for leave to amend, the Court must assume the veracity of the proposed complaint's pleaded facts—here that PRA, LLC told Ms. Hammett she owed a debt she didn't owe, and thus that PRA, LLC made a false statement about the amount of a debt owed.  The Proposed Second Amended Complaint alleges enough to survive a motion to dismiss on this claim and is therefore not futile.  PRA, LLC does not argue otherwise.  The Court will allow amendment insofar as Ms. Hammett now has a claim against only PRA, LLC for a violation of 15 U.S.C. § 1692e(2)(A).

---

[456] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Am. (Doc. 33-1) ¶¶ 323–30.

[457] *Id.* ¶ 315.

[458] *Id.* ¶ 316.

### III.  Ms. Hammett's Motion for Partial Summary Judgment

On November 22, 2021, Ms. Hammett filed a Motion for Partial Summary Judgment.[459] The Motion is narrow, seeking summary judgment only on the single claim that PRA, LLC violated 15 U.S.C. § 1692e(A)(2) of the FDCPA.[460]  The Operative Complaint did not allege a violation of this provision.  PRA, LLC noticed that omission.[461]  Nonetheless, the Court will decide this issue because (1) the Court has concluded *supra* Section II.G that it will grant Ms. Hammett leave to amend the Operative Complaint to include this claim, and (2) PRA, LLC responded to the partial summary judgment motion on the merits.

Under 15 U.S.C. § 1692e(2)(A), a debt collector violates the FDCPA if, "in connection with the collection of any debt," it makes a "false representation of the "amount . . . of any debt." Ms. Hammett's basis for summary judgment is that PRA, LLC violated this provision "by making the false claim that Hammett owed PRA[, LLC] $2,297.63."[462]  But, on this record, it does not appear to be genuinely disputed that Ms. Hammett owed PRA, LLC $2,297.63.[463]  That is, the

---

[459] Pl.'s Mot. for Partial Summ. J. (Doc. 37).

[460] *Id.* at 6.

[461] Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. (Doc. 52) (Under Seal) at 3.

[462] Pl.'s Mot. for Partial Summ. J. (Doc. 37) at 2.

[463] *See supra* notes 13–25 and accompanying text (illustrating that the record likely leads to only one possible conclusion—that Ms. Hammett owed PRA, LLC $2,297.63). Ms. Hammett concedes that she "probably" opened a Capital One account in 2001. Hammett Dep. Vol. I (Doc. 164) at 80:4–12, 81:15–18, 82:10; *see also* Aff. in Supp. of Pl.'s Partial Mot. for Summ. J. (Doc. 39) ¶ 2 ("I am a consumer in respect to any debt incurred by me on a credit card issued by Capital One Bank (USA) in or about 2001."). PRA, LLC has produced documentary evidence indicating that, in 2001, Ms. Hammett opened a Capital One account ending in -6049. Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121). Ms. Hammett says that she does not "have any written record of a Capital One account . . . and therefore [does] not know the account number of any account [she] may have had." Aff. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 99) (Under Seal) at 1. The fact that Ms. Hammett does not know the account number is not sufficient to raise a genuine dispute of fact as to whether she opened a Capital One account ending in -6049.

PRA, LLC has produced documentary evidence from Capital One showing that, in 2011, Ms. Hammett (then Laura J. Lynn) was seven months past due on the Capital One account ending in -6049. Ex. 13A to Hammett Dep. (Doc. 164); *see also* Def.'s Notice of Suppl. Authority (Doc. 106-1) at 3, 5. This documentary evidence is a Capital One statement sent to Ms. Hammett at an address where Ms. Hammett admits to having once lived. Hammett Dep. Vol. I (Doc. 164) at 91:1–11. The account balance was $1,916.05. Ex. 13A to Hammett Dep. (Doc. 164); *see also* Def.'s Notice of Suppl. Authority (Doc. 106-1) at 3, 5. PRA, LLC has also produced "load data" from Capital One

Court (tentatively) believes that every rational juror would conclude that Ms. Hammett owed PRA,

LLC this amount.  In turn, there is good reason to think that no rational juror could conclude that

PRA, LLC falsely represented to Ms. Hammett the amount of the debt.  That's the exact opposite

of the conclusion the Court would have to reach in order to give Ms. Hammett summary judgment

on this claim.[464]  Ms. Hammett's Motion is DENIED.

---

showing that PRA, LLC purchased Ms. Hammett's Capital One account at a time when Ms. Hammett's -6049 account had a balance of $1,916.05 and a post-charge-off amount of $381.58. Ex. C (Load Data Sheet) to Ex. 1 to Def.'s Statement of Facts (Doc. 78-6) (Under Seal at Doc. 121). Those amounts total the amount of the debt ($2,297.63) that PRA, LLC has always tried to recover from Ms. Hammett. Hammett Dep. Vol. II (Doc. 164) at 21:19–20 (stating that PRA, LLC "always tried to collect $2,297.63").

Ms. Hammett admits that she made purchases on the Capital One account. Aff. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. 39) ¶ 3. She denies owing the debt, but her testimony is entirely unclear as to why she does not owe the debt. Hammett Dep. Vol. I (Doc. 164) at 82:21–83:12. And her blanket denial is supported by no other evidence. Ms. Hammett testified that she has "no documentary evidence" of the purchases because they were made "10 to 20 years ago." Aff. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. 39) ¶ 3. She notes that she has "no evidence of a debt . . . ." *Id.* ¶ 4. And she notes generally that she "usually paid credit cards off on time." Hammett Dep. Vol. I (Doc. 164) at 104:22–23. At bottom, Ms. Hammett's testimony appears to be clear that she doesn't know what happened with her Capital One account, but she "believe[s]" she never had a debt . . . ." Aff. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. 39) ¶ 4; *see also* Hammett Dep. Vol. II (Doc. 164) at 13:5–12 (Ms. Hammett stating that she "do[es]n't know" what happened to her Capital One account and that she "do[es]n't think" that her Capital One account went delinquent). Belief is not fact. Belief is not enough to create a genuine dispute of fact.

Ms. Hammett never (by way of affidavit or testimony) testified that she paid off her Capital One balance on time. Ms. Hammett never says she paid off her Capital One balance at all. In fact, Ms. Hammett admits that 2011 was a "crazy time" in her life. Hammett Dep. Vol. I (Doc. 164) at 104:24–105:. Trying to turn the tables, she says that if Capital One could have given Ms. Hammett "any kind of documentation that shows [Ms. Hammett] purchased something and [Ms. Hammett] remembered purchasing it, then that might convince" her that the Capital One statement showing that Ms. Hammett owed $1,916.05 was accurate. *Id.* at 103:17–21, 104:25–105:4. But the implication of Ms. Hammett's position is telling. The fact that Ms. Hammett could be convinced with more documentation fatally undermines her blanket denial of owing the debt.

The tenuousness of Ms. Hammett's position is further illustrated by her Motion for Partial Summary Judgment. As discussed in footnote 464 *infra*, Ms. Hammett almost exclusively relies on two very recent letters from PRA, LLC to suggest that PRA, LLC knew she didn't owe any money to PRA, LLC: (1) a February 19, 2021 PRA, LLC letter stating that Ms. Hammett had a balance of $2,297.63, and (2) an April 23, 2021 PRA, LLC letter stating that Ms. Hammett's balance was $0.00. Pl.'s Statement of Facts (Doc. 38) at 2; Exs. A, B to Aff. in Supp. of Pl.'s Mot. for Partial Summ. J. (Docs. 39-1, 39-2). But, for reasons explained below, this documentation does not support her position at all.

[464] At the very least, Ms. Hammett is not entitled to summary judgment on the issue. Here's how Ms. Hammett gets to her conclusion that PRA, LLC lied to her about owing a debt to PRA, LLC. First, she says PRA, LLC represented that Ms. Hammett owed this amount on a February 18, 2021 phone call between herself and PRA, LLC. Pl.'s Aff. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. 39) ¶ 6. Second, Ms. Hammett says PRA, LLC repeated this representation "by letter dated '02/19/2021'" (the debt-dispute letter). *Id.* ¶ 6; *see also* Ex. A (the February 19, 2021 debt-dispute letter) to Pl.'s Aff. in Supp. of Partial Summ. J. (Doc. 39-1) at 2; Pl.'s Mot. for Partial Summ. J. (Doc. 37) at 2 (referencing Exhibit A). Third, "[b]y letter dated '04/23/2021,' . . . PRA, LLC admitted the balance on the purported account was '$0.00' and closed the account." Pl.'s Aff. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. 39) ¶ 7; *see also* Ex. B to Pl.'s Aff. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. 39-2) at 2–3. Fourth, Ms. Hammett did not pay PRA, LLC anything. Pl.'s Mot. for Partial Summ. J. (Doc. 37) ¶ 7. According to Ms.

Given that PRA, LLC has moved for summary judgment on every one of Ms. Hammett's claims, it is fair to believe that PRA, LLC would have moved for summary judgment on this claim had it been live at the time PRA, LLC initially moved for summary judgment. For this reason, the Court will give PRA, LLC fourteen days from the date of this Order to supplement its Motion for Summary Judgment (and briefing). The supplement must be limited to requesting summary judgment on this issue and arguing in support of that request.

## CONCLUSION

For the reasons stated above, the Court GRANTS in its entirety PRA, LLC's Motion for Summary Judgment. The Court DENIES Ms. Hammett's Motion for Partial Summary Judgment. The Court GRANTS in part and DENIES in part Ms. Hammett's Motion to Amend. The Clerk is directed to file the Second Amended and Supplemented Complaint.[465] The Court emphasizes that, pursuant to this Order, the only live claim remaining in this case is Ms. Hammett's claim against PRA, LLC for a violation of 15 U.S.C. § 1692e(2)(A). If PRA, LLC so chooses, it will have fourteen days from the date of this Order to supplement its Motion for Summary Judgment for the limited purpose of arguing the propriety of summary judgment in its favor as to Ms. Hammett's claim under 15 U.S.C. § 1692e(2)(A). Ms. Hammett will have seven days to respond to any supplement that PRA, LLC files on this issue. If PRA, LLC chooses not to supplement its Motion for Summary Judgment, PRA, LLC must file an answer to the Second Amended and Supplemented Complaint in conformance with the Federal Rules of Civil Procedure.

---

Hammett, because she did not pay PRA, LLC between the February communications and the April account-closing letter, the only reasonable explanation is that she never owed PRA, LLC in the first place. Pl.'s Mot. for Partial Summ. J. (Doc. 37) ¶ 8. The April 23, 2021 letter never "admitted" that Ms. Hammett owed no debt. So to buy Ms. Hammett's argument, a rational juror would have to draw numerous (unreasonable) inferences in Ms. Hammett's favor. On summary judgment, though, the inferences go in favor of the nonmovant (here PRA, LLC). Thus, even taking Ms. Hammett's evidence at face value, she has failed to meet her burden of presenting the absence of a genuine dispute of material fact on this claim.

[465] Ex. 1 (Proposed Second Am. & Suppl. Compl.) to Pl.'s Mot. to Amend (Doc. 33-1).

IT IS SO ORDERED this 16th day of August 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE